Douglas DOBSON

v.

**HARTFORD FINANCIAL SERVS., et al.**

No. 3:99CV2256 (JBA).

United States District Court,
D. Connecticut.

March 8, 2002.

Victoria De Toledo, Casper & de Toledo, Stamford, CT, Daniel M. Feinberg, Jeffrey Lewis, Sigman, Lewis & Feinberg, Oakland, CA, Mark D. DeBofsky, DeBofsky & DeBofsky, Chicago, IL, for Plaintiff.

Vaughn Finn, Shipman & Goodwin, Hartford, CT, Rick H. Rosenblum, Thomas E. Sanders, Akin, Gump, Strauss, Hauer & Feld, San Antonio, TX, for Defendants.

## MEMORANDUM OF DECISION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

[Doc. ## 47, 53, 57, 75]

ARTERTON, District Judge.

### I. Introduction

Plaintiff Douglas Dobson is a disabled anesthesiologist whose monthly long term disability ("LTD") payments of $10,000 per month were withheld for over a year while defendant Hartford Life and Accident Insurance Company ("Hartford") claimed to be seeking additional proof of his continued disability. Dobson claims that Hartford improperly denied him and the purported class members interest owed to them under the terms of the LTD plan on retroactive benefits payments, in violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), and claims that Hartford failed to inform him or the putative class members of the existence of an *"ex gratia"* practice of paying such interest on request and under certain circumstances, in breach of Hartford's fiduciary duty, in violation of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Plaintiff also asserts a class and individual § 502(a)(3) breach of fiduciary duty claim based on Hartford's refusal to pay accrued interest for wrongfully withheld benefits, seeking such interest or disgorgement of Hartford's profits on such withheld sums. Plaintiff has moved for class certification [Doc. # 53] and for summary judgment on the class claims [Doc. # 47]. Hartford has cross-moved for summary judgment on plaintiff's claims for interest under § 502(a)(1)(B) and § 502(a)(3) [Doc. # 57] and on the § 502(a)(3) class claim alleging unlawful non-disclosure of the *ex gratia* payment policy [Doc. # 75].

Oral argument on the cross-motions was held on January 7, 2002. The next day, the Supreme Court issued its opinion in *Great–West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), and the day following, the Second Circuit decided *Dunnigan v. Metropolitan Life Ins. Co.,* 277 F.3d 223 (2d Cir.2002). The Court invited supplemental briefing on the impact of these two decisions, which indisputably altered the landscape for plaintiff's ERISA claims. The question for this Court, however, is the scope and extent of these changes.

Plaintiff claims that *Dunnigan* now compels summary judgment in his favor on his claims under § 502(a)(1)(B) or alternatively for the § 502(a)(3) claim for interest. Defendant, in turn, argues that *Dunnigan's* holding is no longer good law in light of *Knudson.* For the reasons discussed below, the Court agrees with both parties in part and disagrees in part. De-

fendant's motions for summary judgment are granted as to the class claims under § 502(a)(1)(B) and § 502(a)(3), and the *ex gratia* practice claim under § 502(a)(3), and denied as to the § 502(a)(3) claim for individual relief for breach of fiduciary duty. Plaintiff's motion for summary judgment is denied, and the motion for class certification is denied as moot.

## II. Factual background

Dr. Dobson was employed as an anesthesiologist with West Central Anesthesiology Group, Ltd. until he became disabled in 1993 due to obstructive sleep apnea which led to excessive daytime somnolence. Dobson is a participant in West Central's long term disability plan ("the Plan"), which provides disability benefits through an insurance policy issued by Hartford.

Hartford originally approved plaintiff's claim for LTD benefits, and began paying him a monthly benefit of $10,000, less tax withholding, in 1993. However, on April 7, 1997, Hartford informed plaintiff that his benefits would be terminated effective March 31, 1997 due to lack of proof of continuous disability. Plaintiff was invited to submit additional documentation supporting his claim of continued disability, and was informed that the file would be closed if Hartford did not receive the requested information within the next thirty days.[1]

Although plaintiff did submit additional information, both he and his doctor, David Murdy, asserted that because plaintiff's disability resulted from craniofacial abnormalities which would not be expected to change favorably over time, additional clinical testing was unnecessary. Hartford, however, maintained that because Dr. Murdy's diagnosis relied on testing performed prior to the date of onset of disability, the documentation was inadequate and a current examination and diagnosis was required.[2]

Hartford did not, however, deny plaintiff's claim for benefits outright. Instead, it claimed to have "suspended" benefits, and refused plaintiff's request for documentation supporting the termination of benefits, taking the position that because the claim was not actually denied, plaintiff was not yet entitled to review the claim file documents.[3] On October 3, 1997, Hartford determined that plaintiff's proof of loss was insufficient, and finally informed plaintiff of his right to appeal that determination.[4] Plaintiff requested review of the denial pursuant to ERISA § 503 and Department of Labor regulations, and requested that Hartford reinstate his LTD benefits pending the outcome of the review process because those benefits were his family's primary source of income. Hartford refused to do so.

During the fall of 1997, plaintiff was seen by Dr. Guillermo doPico, at the Sleep Disorders Clinic at the University of Wisconsin. Dr. doPico diagnosed plaintiff as disabled for performance of his occupation

---

1. *See* HART 5848 (April 7, 1997 Letter from Dana Baiocchi to Douglas Dobson). (Excerpts from the claim file referenced herein are attached at Ex. H to the Second Declaration of Dan Feinberg, Doc. # 86.)

2. *See* HART 5815 (April 30, 1997 Letter from Dana Baiocchi, LTD Senior Benefits Manager, to Douglas Dobson); HART 5770 (May 30, 1997 Letter from Douglas Dobson to Dana Baiocchi); HART 5754 (July 14, 1997 Letter from Marcella Curtis, Claim Examiner, to Douglas Dobson).

3. *See* HART 5749 (July 22, 1997 Letter from Marcella Curtis to Douglas Dobson); Dep. of Bruce Luddy, vol. 2 ("Luddy Dep. II") at 177.

4. *See* HART 5731–33 (Oct. 3, 1997 Letter from Marcella Curtis to Douglas Dobson).

as an anesthesiologist due to excessive daytime somnolence, and noted that "[a]lthough the cause of his excessive daytime somnolence may be just obstructive sleep apnea, which is actually quite significant and worse than in 1993, I feel that it is actually multifactorial. . . . In my opinion, the pathogenesis of his sleep disorder is very complex. It does include obstructive sleep apnea, sleep paralysis, altered sleep hygiene, phase shifting, and perhaps 'idiopathic hypersomnia.' " [5] Despite this conclusion from Dr. doPico, Hartford did not reinstate benefits, but instead requested the actual test results for review; [6] requested a second opinion from a Dr. Corson based on his independent review of Dobson's medical history and recent test results; [7] and on November 24, 1997, denied plaintiff's claim again based on Dr. Corson's statement that Dobson had not undergone "an evaluation by a board certified sleep specialist at an accredited sleep center," and therefore the proof of loss was insufficient. [8] Plaintiff was again informed of his rights to appeal under ERISA. [9]

On January 8, 1998, plaintiff's counsel wrote to Ms. Curtis, a Hartford Claim Examiner, informing her that Dr. Corson was incorrect: there is no board certification of sleep specialists recognized by the American Board of Medical Specialities,

and the University of Wisconsin is an accredited sleep center. In addition, Dr. doPico wrote independently to Ms. Curtis to express his indignation at the cursory—and incorrect—conclusions reached by Dr. Corson. [10] On May 8, 1998, Hartford wrote to plaintiff informing him that it had concluded the appeal in his favor and that his benefits would be reinstated effective April 1, 1997. Hartford provided no explanation for the change in its position. On April 22, 1998, plaintiff was paid twelve months of retroactive benefits, plus the currently due payment for April 1998, in a lump-sum payment of $130,000, less tax withholding, without interest.

Bruce Luddy, a Hartford Manager whose duties include managing the staff that handles LTD claim appeals, stated in his deposition that while as a general practice Hartford does not pay interest on retroactive benefits, Hartford does have an informal practice of paying interest on certain retroactive LTD benefits payments, which it refers to as *"ex gratia"* payments. [11] These payments are made under benefit code 786. This code is used to "allow for an outflow of money that has no other ledger location in Hartford's records." [12] There is no written policy that governs Hartford's determination to make interest payments, and the Plan documents contain no reference to any such

---

**5.** HART 5723 (Sept. 27, 1997 Letter from Gulliermo doPico to David Murphy).

**6.** *See* HART 5717 (Oct. 14, 1997 Letter from Marcella Curtis to Mark DeBofsky).

**7.** *See* HART 5704 (Nov. 6, 1997 Letter from Marcella Curtis to Denise Thiede, RN).

**8.** *See* HART 5689 (Nov. 24, 1997 Letter from Marcella Curtis to Mark DeBofsky). The report from Dr. Corson was not included in the claims file produced by Hartford to plaintiff, and plaintiff has not received a copy of Dr. Corson's report to date. *See* Second Dec. of Dan Feinberg, ¶ 5.

**9.** *Id.*

**10.** *See* HART 5644–49 (Jan. 8, 1998 Letter from Mark DeBofsky to Marcella Curtis).

**11.** *Ex gratia:* Act of grace; as a matter of grace, favor or indulgence; gratuitous. A term applied to anything accorded as a favor; as distinguished from that which may be demanded *ex debito,* as a matter of right. *Blacks Law Dictionary* 573 (6th Ed.1990).

**12.** Supp. Aff. of Bruce Luddy, ¶ 2.

policy or practice.[13] Under this "policy," Hartford considers specific requests for interest and makes a payment if it determines that the circumstances of the claims handling warrant such a payment.[14] Bruce Luddy further explained in his affidavit that:

In situations where a claimant, their representative, or a third-party such as the Plan Sponsor, makes a claim for the payment of interest, Hartford reviews the participant's claim file and Hartford's handling of the claim to make a determination as to whether to settle the dispute. There are other factors, unrelated to the actual LTD claim that Hartford may consider in making its business decision. For example, there are instances where the request for an "*ex gratia*" payment might be made by the Plan Sponsor, Plan Administrator, or the insurance broker who services the account in question. In those situations, Hartford may weigh the business relationships involved in determining whether to make an "*ex gratia*" payment.

Hartford does not have any written policies or guidelines regarding "*ex gratia*" interest payments nor does any one corporate officer or director make all such decisions. Instead, in each in-stance, Hartford weighs the relative costs and benefits involved in resolving the dispute, and in some circumstances an "*ex gratia*" interest payment may be made. In each instance where an "*ex gratia*" payment of interest is made, Hartford does not admit liability for the payment of such interest. Further, Hartford generally obtains a release from the claimant in connection with the dispute.[15]

Hartford maintains that any payment of interest under this informal practice is not paid pursuant to any provision of the applicable LTD policy.[16]

Hartford's record-keeping does not always distinguish between interest payments made as a result of litigation and payments made under the *ex gratia* policy, and plaintiff's counsel represents that based on his review of the claim files provided by Hartford, Hartford has made *ex gratia* payments in three to five instances since 1998.[17] At least one letter from plaintiff's counsel requested interest on the withheld payments,[18] and Bruce Luddy stated in his deposition that a claimant was not required to renew the request for interest following payment of benefits in order to be considered under the *ex gratia* policy.[19] Dr. Dobson did not renew his

---

**13.** *See* Luddy Dep. I at 48–55, 61.

**14.** *Id.* at 61–67.

**15.** Luddy Aff. ¶¶ 3–4. Plaintiff argues that the Court should reject Luddy's affidavit testimony as contradictory of his deposition testimony. Luddy was asked in his deposition:

Q: ... Are there any practices, formal or informal, that Hartford follows in determining whether to pay interest on retroactive benefits under long-term disability policies?
A: Yes.
Q: What are those?
A: If there is a request for interest, we'll consider the circumstances of the claim, the circumstances of the claim handling is a better way to put it, and in some circumstances agree to the request.

Luddy Dep. I at 61–62. Luddy was not asked whether the claim handling was the exclusive consideration, however, and the additional factors outlined in the affidavit would appear to be encompassed within the "circumstances of the claim" to which Luddy originally referred. Thus the affidavit testimony, while more detailed, does not contradict his deposition testimony, and will be considered.

**16.** *See* Luddy Dep. at 71.

**17.** *See* Decl. of Dan Feinberg, ¶ 10.

**18.** *See* HART 5721 (Oct. 10, 1997 Letter from Mark DeBofsky to Marcella Curtis).

**19.** *See* Luddy Dep. II at 157.

request for interest following the payment of the lump sum in April 1998, and was not paid interest under Hartford's *ex gratia* policy.

## III.  Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Once the moving party's initial burden has been met, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir.2000).

On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judg-ment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993) (*citing Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 313 (2d Cir.1981)). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (*citing Schwabenbauer*, 667 F.2d at 314).

## IV.  Discussion

> *A.  ERISA § 502(a)(1)(B) claim for interest owed on past-due LTD benefits as a term of the LTD Plan*

Plaintiff moves for summary judgment on the claim that Hartford breached the terms of the LTD Plan by withholding interest on retroactive benefits, or alternatively, that interest in compensation for retroactive payments should be treated as an implied term of the Plan.[20] Hartford has cross-moved for summary judgment on these claims, arguing that the Plan terms do not provide for interest, that absent any such provision, interest is an extra-contractual remedy impermissible under ERISA, and that the Court should not create an implied interest term.

■ The first issue is the appropriate standard of review of Hartford's interpretation of the Plan language. Hartford claims that the appropriate standard of review is whether its determination was arbitrary and capricious because it is granted full discretion under the Plan to determine eligibility for benefits.[21]  *See*

---

**20.** Whether the retroactive lump-sum payment is "late" depends on whether it was timely paid under the terms of the Plan. As this is in dispute, the Court refers to the lump-sum payment as a "retroactive" payment except where plaintiff alleges that the payments were wrongfully withheld by Hartford, as in his individual § 502(a)(3) claim.

**21.** The Plan clearly provides that "The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Plan." LTD Plan at 3.

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). "Where the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard." *Kinstler v. First Reliance Std. Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir.1999). In contrast, under the *de novo* standard of review, courts apply "traditional principles of contract interpretation," *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 230 (2d Cir.1995), and "unambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning." *Aramony v. United Way Replacement Benefit Plan,* 191 F.3d 140, 149 (2d Cir.1999).

Notwithstanding the grant of discretion to Hartford in the Plan language, plaintiff argues that no deference is owed to Hartford's plan interpretation because of the financial conflict of interest that results from Hartford's desire to retain the investment income on withheld benefits pending appeal. According to plaintiff, this financial interest impermissibly colors Hartford's interpretation of the Plan language and renders it suspect. Defendant maintains that plaintiff's conclusory allegations of a conflict of interest are insufficient as a matter of law to trigger the higher standard of review.

In *Bruch,* the Supreme Court held that an alleged conflict of interest does not actually change the standard of review but instead becomes "a facto[r] in determining whether there is an abuse of discretion." 489 U.S. at 115, 109 S.Ct. 948 (internal quotations omitted). Thus, the appropriate standard of review here appears to be whether Hartford's interpretation is an abuse of discretion. However, under either the more stringent *de novo* standard

or the deferential abuse of discretion standard, the Plan language in dispute here permits only one reasonable interpretation.

■ The parties agree that extra-contractual remedies for breaches of Plan terms are not available under § 502(a)(1)(B). *See Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (noting that "the statutory provision explicitly authorizing a beneficiary to bring an action to enforce his rights under the plan— § 502(a)(1)(B) ...—says nothing about the recovery of extracontractual damages, or about the possible consequences of a delay in the plan administrators' processing of a disputed claim"); *Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir. 1993). While it is further undisputed that the Plan itself contains no express mention of interest owed on retroactive benefits payments, the parties disagree as to whether plaintiff's claim for interest is properly characterized as extra-contractual or is instead an implicit term of the Plan itself.

Plaintiff argues that the payment of interest is required as part of the Plan itself, and therefore recoverable under § 502(a)(1)(B), because the Plan provides for payment of accrued benefits at the end of each month in which he was disabled. Hartford, in turn, contends that absent an express plan provision creating an obligation to pay interest, no such obligation exists, relying on caselaw characterizing interest on delayed benefits as extra-contractual.[22]

The relevant Plan provisions here are as follows:

---

**22.** As discussed below, the district court cases relied upon by Hartford for this proposition, including *Dunnigan v. Metropolitan Life Ins. Co.,* 99 F.Supp.2d 307 (S.D.N.Y.2000), have been called into question by the Second Circuit's recent decision vacating and remanding *Dunnigan. Dunnigan,* 277 F.3d 223 (2d Cir. 2002).

Article 1.  **Benefit Payment Due to Disability**

You will be paid a monthly benefit if:

(1) you become Disabled while insured under this Plan;

(2) you are Disabled throughout the elimination period;

(3) you remain Disabled beyond the elimination period; and

(4) you submit Proof of Loss satisfactory to The Hartford.

Benefits accrue as of the first day after the Elimination Period and are paid monthly.  No benefit will be paid for any day on which you are not under the care of a Physician.

The Hartford will cease benefit payment on the first to occur of:

(1) the date you are no longer Disabled;

(2) the date you fail to furnish proof that you are continuously disabled;

(3) the date you refuse to be examined, if The Hartford requires an examination;

(4) the date you die;

\*    \*    \*    \*    \*    \*

**Proof of Loss**

Written proof of loss must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment.  After that, The Hartford may require further written proof that you are still Disabled.  If proof is not given by the time it is due, it will not affect the claim if:

(1) it was not possible to give proof within the required time; and

(2) proof is given as soon as possible; but

(3) not later than 1 year after it is due, unless you are not legally competent.

\*    \*    \*    \*    \*    \*

The Hartford reserves the right to determine if Proof of Loss is satisfactory.

\*    \*    \*    \*    \*    \*

**Time Payment of Claims**

If written Proof of Loss is furnished, accrued benefits will be paid at the end of each month that you are Disabled.  If payment for a part of a month is due at the end of the claim, it will be paid as soon as written Proof of Loss is received.

According to plaintiff, because Hartford's May 8, 1998 decision acknowledged that he had remained disabled under the terms of the Plan from March 31, 1997 forward, and Hartford then paid him by lump sum the thirteen months benefits it had withheld pending appeal, it cannot be disputed that he was "disabled" within the meaning of the Plan at the end of each month from March 1997 through April 1998.  Thus, plaintiff's argument goes, Hartford breached the Plan twelve times—at the end of each month during which his benefits were withheld—and Hartford is required to reimburse him for the time-value equivalent of his monthly benefits by paying interest on these retroactive benefits.  Plaintiff's position is premised on the idea that interest is owed, as matter of contract law, on benefits paid months or years after they have already become "due."

Faced with the proof of loss provision, which reserves to Hartford the right to determine whether sufficient proof of disability has been provided, plaintiff argues that the "Benefit Payment Due to Disability" section's requirement of satisfactory proof of loss does not override Hartford's obligation to pay accrued benefits at the end of each month that plaintiff was disabled.  In other words, plaintiff contends that the Proof of Loss provision governs only *whether* benefits will be paid, and the

Time Payment of Claims provision governs *when* they will be paid.

Plaintiff's argument, relying in part on *Canseco v. Construction Laborers Pension Trust,* 93 F.3d 600, 607 (9th Cir.1996), ignores the fact that "whether" benefits will be paid is a crucial predicate to determining when, if ever, the right to benefits has "accrued." In *Canseco,* the pension plan at issue provided that beneficiaries were eligible for benefits after meeting certain age, hour and years of service requirements, but that benefits were to be paid only upon application. When the plaintiff submitted a belated application and sought retroactive payments, the defendant denied the payments, arguing that until the application was submitted, the plaintiff was not eligible for pension benefits, and thus no retroactive payments were due. Interpreting the pension plan, the Ninth Circuit held that the issue of eligibility for pension benefits was independent from that of payment of benefits because the plan guaranteed benefits upon meeting the eligibility criteria, and nowhere conditioned eligibility on submission of an application. However, *Canseco* did not hold that the plaintiff was entitled to *payment* prior to submission of the required application, and thus *Canseco*'s reasoning would apply only if Hartford had refused to pay retroactively benefits for the months during which satisfactory proof of loss had not been supplied until afterwards.

The Court agrees with defendant that to accept plaintiff's theory of automatic independent breaches at the end of each month giving rise to an interest payment obligation, the Court would have to find that the Plan required Hartford to pay benefits at end of each month *regardless* of whether the participant had established compliance with eligibility and coverage requirements of the Plan. While plaintiff argues that incorporating the proof of loss requirement into the time payment clause would strip the "monthly benefit" term of meaning, plaintiff's proposed Plan interpretation is impossible to reconcile with the various eligibility requirements that condition Hartford's obligation to pay *any* benefit on satisfactory proof of loss.

In *Dunnigan v. Metropolitan Life Ins. Co.,* 277 F.3d 223 (2d Cir.2002), the Second Circuit recently addressed a similar claim in *dicta.* The district court had held that because the policy language, similar to that at issue in this case, did not expressly provide for interest and conditioned payment on satisfactory proof of disability, benefits were not due or accrued until such proof had been submitted, and therefore the plan did not provide for recovery of the time value of the withheld benefits.[23] The Second Circuit vacated the decision on other grounds, but noted that the district court may have "exaggerated [the] concern" that it would be difficult to ascertain when benefits were due because the plan required satisfactory proof of loss, observing that:

> In many instances, the plan administrator would not need to delay payments to ascertain whether the proof of claim of disability was satisfactory. The Plan itself provides an "Elimination Period" of ninety consecutive days of disability before which no claims are payable. If the claim and proofs are filed during the Elimination Period, it provides a buffer during which the claims and proofs may

---

**23.** In that case, the governing policy stated that " 'When we receive proof that you are Disabled, we will pay a Monthly Benefit in accordance with the Schedule of Benefits.' " *Dunnigan,* 99 F.Supp.2d at 316. A second provision, relied on by Ms. Dunnigan, was entitled "Time Limit for Payment of Claim" and stated that " 'If the written proof of a claim; (a) has been made on time; and (b) is satisfactory to us; we will pay the accrued benefits monthly at the end of the period for which they are due.' " *Id.*

be evaluated without requiring any delay in payment.

And if the claim and proofs are submitted either after, or near the end of, the Elimination Period so that the Plan administrator might require some further time to determine whether the proofs are satisfactory, a court could with relative ease determine the duration of a reasonable period thereafter, following which an interest obligation might arise. MetLife does *not* contend that the timing of its ultimate coverage decision depended on some change in circumstance over the intervening years, such as the submission of additional information, a change in diagnosis, a change in coverage, policy or procedure, or a change in medical knowledge. *Absent good cause shown* by the Plan administrator justifying a longer period, it is arguable that the ninety-day period specified by the regulations of the Secretary of Labor ... for the making of such determinations, defines the duration of the reasonable period during which the Plan is not chargeable with interest.

277 F.3d at 230–31 (emphasis added).[24]

Plaintiff cites this language in support of his alternative class claim based on the theory that long-term disability plans contain "an implied term requiring that the plan administrator determine within a reasonable period of time whether proof of loss was satisfactory or pay interest on any benefits delayed after expiration of that time." Pl. Supp. Br. at 6. However, despite plaintiff's urging, the Court does not find in this language a *holding* that any payment outside the Secretary of Labor's regulations is unreasonable. Instead, the Second Circuit simply observed that it would be possible to ascertain a point at which it became unreasonable for MetLife to continue to insist that satisfactory proof of loss had not yet been submitted, after which an interest obligation might arise. Although the Court certainly could determine the point at which a claimant such as Dr. Dobson had submitted sufficient proof of loss after which Hartford's continued denial was unreasonable, plaintiff argues that the Court should find that he and the class are entitled to summary judgment because *any* delay after the periods specified in the Department of Labor regulations is unreasonable, notwithstanding the specific provisions of the LTD Plan that grant Hartford the right to determine whether satisfactory proof of loss has been submitted.[25] While the Department of Labor regulations may indeed provide guidance as to the reasonableness of the timing of Hartford's decisionmaking, even under

---

**24.** Because the Second Circuit found that plaintiff was entitled to interest under § 502(a)(3) to compensate her for the unreasonable delay in payment, it expressly declined to resolve whether the § 502(a)(1)(B) claim permitted recovery of interest. *See id.* at 231.

**25.** Notably, plaintiff's claim here is not based on an allegation that his benefits were wrongfully withheld because Hartford acted arbitrarily and capriciously in suspending his benefits without any medical basis and then unreasonably refusing to reinstate them. Although plaintiff does concede in his supplemental motion, as he must, that *recovery* for any class member would be subject to determining "when Hartford received proof of dis-

ability," Pl. Supp. Br. at 16, plaintiff's alternative class (for which he seeks summary judgment) is cast in terms of a *per se* violation for anyone receiving payments after the regulatory time period expired. By proposing that defendant can at some later point offer evidence as to each class member on the justification for payment delays, plaintiff necessarily demonstrates why this claim cannot be appropriate for class disposition, i.e., it lacks commonality of fact or law, except as proposed to be predicated on *per se* unreasonableness. Thus the claim must be either one of *per se* unreasonableness, or an individual claim that is not susceptible to class treatment. Therefore, because plaintiff seeks class recovery, the Court construes the claim as a *per se* claim of unreasonableness.

the reasoning of *Dunnigan*, plaintiff's claims of entitlement to summary judgment on this class claim must fail, as the determination of whether Hartford lacked justification for withholding benefits after that time period expired would require an individualized determination of the circumstances under which Hartford assessed the proof of loss submitted by each putative class member. As plaintiff's claim is based on a *per se* allegation of unreasonableness, however, the Court finds that Hartford is entitled to summary judgment in its favor because it is not automatically a violation of the Plan to delay payment of LTD benefits while requesting satisfactory proof of loss, and absent any late payment that amounts to a Plan violation, plaintiff has no entitlement to interest.[26]

Alternatively, plaintiff argues that the Court should find that Hartford has breached an implied term of the Plan requiring payment of interest on all retroactive payments of benefits. Again, this class claim seeks a *per se* remedy for the delay occasioned by the retroactive payments, rather than a remedy for unreasonably delayed benefits based on the claims handling in Dr. Dobson's particular case. Plaintiff argues that because a long-delayed lump-sum payment of monthly disability benefits does not serve the purpose of replacing an injured plan participant's lost monthly wages, an implied term for payment of interest is necessary to prevent the promise of a monthly benefit from being rendered illusory.

However, plaintiff cites no cases in which a provision for payment of interest for the time value of money withheld pending determination of qualification for benefits, regardless of when the payments actually became unreasonably untimely, has been implied under § 502(a)(1)(B). The *Dunnigan dicta*, relied on by plaintiff, does not support this claim as the Second Circuit's discussion of the availability of interest as an implied term was based on a theory that "*unexcused* delay can give rise to an obligation to pay interest." 277 F.3d at 230 n. 5 (emphasis added).[27] As defendant notes, implication of a *per se* remedy for the time lapse would significantly alter the terms of the Plan and would substantially expand the remedies to which plaintiff is otherwise entitled under § 502(a)(1)(B), i.e., the benefits owed under the terms of the Plan.

Finally, although the Second Circuit in *Dunnigan* noted in a footnote that "entitlement to interest is not consequential damages," 277 F.3d at 239 n. 5, and therefore presumably not within the category of extra-contractual or compensatory damages for which recovery is foreclosed by *Russell*,[28] as Hartford observes, it is diffi-

---

**26.** The difference in procedural posture between this case and *Dunnigan* is significant. In *Dunnigan*, the lower court had granted a motion to dismiss, notwithstanding plaintiff's allegation that her benefits had been unreasonably withheld for a five year period; here, in contrast, plaintiff seeks summary judgment on a class claim based on the position that *any* delay past the the expiration of the regulatory period is unreasonable, even though *Dunnigan* recognized that a delay is only unreasonable if Hartford lacked good cause.

**27.** Plaintiff also argues that *Fotta v. Trustees of the United Mine Workers of Am.*, 165 F.3d 209, 213 (3d Cir.1998), suggests that a provision for payment of interest should be implied

in ERISA plans under § 502(a)(1)(B) under these circumstances. In *Fotta*, however, the plaintiff brought suit under § 502(a)(3), and the Third Circuit, like the Second, suggested only that interest on late payments might be an implied contractual term.

**28.** While the court stated elsewhere in the opinion that "[w]e disagree with MetLife's contention that, under those precedents, interest on late payments must be seen as an award of noncontractual compensatory damages falling outside the scope of § 502(a)(3)(B)'s remedies," *id.* at 229, that discussion was related only to whether interest was appropriate equitable relief under § 502(a)(3).

cult to reconcile this statement with the consistent treatment of pre-judgment interest in ERISA cases as equitable relief available to prevent unjust enrichment and compensate the beneficiary for the lost time-value of improperly withheld benefits. *See, e.g., Algie v. RCA Global Communications, Inc.,* 891 F.Supp. 875, 898 (S.D.N.Y. 1994) (pre-judgment interest is available equitable relief) (*citing Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.1984)), *aff'd,* 60 F.3d 956 (2d Cir.1995); *Mendez v. Teachers Ins. & Annuity Ass'n & Ret. Eq. Fund,* 982 F.2d 783, 790 (2d Cir.1992) (same); *Katsaros,* 744 F.2d at 281 ("it is well-settled that ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries including the award of pre-judgment interest"). If pre-judgment interest awarded to a beneficiary who prevails on a claim for wrongfully withheld benefits is equitable relief requiring the exercise of judicial discretion, *see Wickham Contracting v. Local Union No. 3 IBEW, AFL–CIO,* 955 F.2d 831, 834–35 (2d Cir.1992), the Court sees no rationale for finding that the interest payments sought here are a term of the Plan itself, rather than an "extra-contractual"—in the sense of not specifically provided for in the LTD Plan—remedy for the breach.

However, the Court need not resolve at this time whether interest, or pre-judgment interest, is properly characterized as only a compensatory remedy for breach of contract or only an equitable remedy, or both, or could also be an implied term of any contract for payment of money, because, as previously noted, plaintiff's class claim rests on an untenable contract analysis. Even if interest were available under § 502(a)(1)(B) for a plan breach, because plaintiff's class allegations do not constitute a breach of the LTD Plan, defendant is entitled to summary judgment on plaintiff's § 502(a)(1)(B) claim and plaintiff's cross-motion is denied.

## B. ERISA § 502(a)(3) claim based on ex gratia *payments*

■ Plaintiff also seeks summary judgment on his claim that Hartford's failure to disclose the terms of its *ex gratia* "practice" or "policy" of making interest payments in certain cases upon request violated Hartford's fiduciary duty, and seeks injunctive relief requiring Hartford to disclose this material information to plan participants and to have an independent fiduciary adjudicate any such unpaid interest claims made by class members. Hartford has cross-moved for summary judgment on this claim, arguing that the payment of interest in settlement of a handful of disputed claims does not amount to a "policy," and that the payment of interest in those limited cases was a business decision and not a matter of claims administration, and therefore does not trigger ERISA's fiduciary duty.

ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." ERISA § 404(a), 29 U.S.C. § 1104(a). This encompasses "a duty to deal fairly and honestly with [plan] beneficiaries." *Ballone v. Eastman Kodak Co.,* 109 F.3d 117, 124 (2d Cir.1997). To establish a claim for breach of fiduciary duty based on alleged misrepresentations about the terms of the Plan, plaintiff must show: (1) that defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that plaintiff relied on those misrepresentation to his detriment. *See Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *Ballone,* 109 F.3d at 126.

Plaintiff here does not allege that Hartford affirmatively misrepresented the terms of the Plan; however, he maintains that the fiduciary duty imposed under

ERISA encompasses a duty to provide complete and accurate information about all material Plan terms even absent any specific request for information from a plan participant. Thus, according to plaintiff, because the Plan itself does not inform participants that they *may* have a right to interest on delayed payments, but Hartford does in fact make such payments on occasion, Hartford breached its fiduciary duty by not informing all participants about the terms of its *ex gratia* policy.

Hartford, however, has consistently maintained that there is no *right* to delay interest under the terms of the Plan, and, as discussed above, the Court agrees with that reading of the Plan language. Thus, the participants were not deprived of information about any *rights* they had under the Plan. In contrast to those cases in which a breach of fiduciary duty has been found where a fiduciary failed to inform participants of material terms of their ERISA plans or of material information effecting their interests under an ERISA plan, the undisputed evidence here shows that Hartford's discretionary and occasional payment of interest in a limited number of disputed cases over the past three years (which Hartford describes as "settlement" even if not through litigation) simply is not a term of the Plan which Hartford might otherwise have a duty to disclose, nor does it materially implicate participants' interest in the Plan, as there is no right to interest under the Plan. These payments are *ex gratia,* not *ex debito.*[29]

### C. Plaintiff's § 502(a)(3) claim for equitable relief

■ Finally, Hartford has also moved for summary judgment on plaintiff's § 502(a)(3) claim for interest or disgorged profits on wrongfully withheld benefits on the grounds such a claim is not permitted under ERISA and alternatively that plaintiff has failed to exhaust his administrative remedies because he did not request payment of interest through Hartford's informal *ex gratia* policy, and has not shown that such a request would have been futile. The Court considers the exhaustion argument first.

### 1. Exhaustion of administrative remedies

The primary purposes of the ERISA exhaustion requirement are to:

(1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not de novo.

*Davenport v. Harry N. Abrams, Inc.,* 249 F.3d 130, 133 (2d Cir.2001) (*quoting Kennedy v. Empire Blue Cross & Blue Shield,* 989 F.2d 588, 594 (2d Cir.1993)). Thus, where a claimant fails to exhaust internal remedies provided by the plan, the ERISA claim will be dismissed, absent a showing of futility or the denial of meaningful access to the claims procedures. *Id.*

Here, it is undisputed that plaintiff's counsel requested payment of interest in a letter sent October 7, 1997, and Bruce Luddy, manager of claims appeals, stated in his deposition that a request for interest need not be renewed following the final determination of eligibility for it to be considered under the *ex gratia* policy. Thus, plaintiff could be said to have exhausted his "remedies" under the *ex gratia* policy. More fundamentally, however, defendant's exhaustion argument is inconsis-

---

**29.** Given this disposition, the Court does not need to reach Hartford's alternative argument that it was not acting as a fiduciary when making the *ex gratia* payments.

tent with its position that the *ex gratia* policy is not a "policy" within the meaning of ERISA. If defendant had no ERISA policy with administrative appeal provisions, as manifested by its failure to even inform plaintiff about its *ex gratia* practice, plaintiff has no exhaustion obligation. Accordingly, this claim is properly before the Court.

2. Claim for interest under ERISA § 502(a)(3)

Originally, plaintiff pursued his § 502(a)(3) claim seeking as equitable relief a constructive trust on Hartford's profits on the wrongfully withheld benefits to remedy the alleged breach of fiduciary duty as an individual claim, recognizing that the determination of whether (and when) Hartford had breached its fiduciary duty was too individualized to permit adjudication as a class claim. Plaintiff now argues that he is entitled to summary judgment on a class claim under § 502(a)(3) because *Dunnigan* "suggests that it is a presumptive breach of fiduciary duty for an insurer to delay payment of disability benefits beyond the time limits specified in the claims procedure regulations." Pl. Supp. Br. at 2. Plaintiff therefore seeks injunctive relief ordering Hartford "to disgorge its profits to all LTD plan participants who received their benefits more than 90 days following Hartford's receipt of a claim or 60 days following Hartford's receipt of a request for review unless Hartford can establish that it had good cause to exceed these time periods in an individual case." Pl. Supp. Br. at 10–11.

Again, however, even if *Dunnigan* does establish such a presumption, plaintiff's proposed class definition necessarily recognizes that whether Hartford was justified in exceeding the time limits in any particular case will require individualized assessment of the information available to Hartford within the regulation period, the complexity of the claim of disability, and other claims handling factors. Thus, the Court does not see any material difference between plaintiff's original individual § 502(a)(3) claim and his refashioned § 502(a)(3) "class" claim, and for substantially the same reasons as identified by the district courts in *Dunnigan*, 99 F.Supp.2d at 325–26; *McDonald v. Pension Plan of the NYSA–ILA Pension Trust Fund*, 153 F.Supp.2d 268, 298–99 (S.D.N.Y.2001); and *Miner v. Empire Blue Cross/Blue Shield*, 2001 WL 96524, *4 (S.D.N.Y. Feb. 5, 2001), and originally recognized by plaintiff in his opposition to summary judgment, the Court finds that class treatment of this claim is inappropriate.

█ The Court now turns to defendant's argument that disgorgement of profits is unavailable to remedy the alleged breach of fiduciary duty.

ERISA § 502(a)(3) provides that:

A civil action may be brought . . . by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) *to provide other appropriate equitable relief* . . . (ii) *to enforce any provisions of this subchapter or the terms of the plan* . . . .

Hartford acknowledges that the Second Circuit in *Dunnigan* held that interest on improperly withheld benefits may be appropriate equitable relief under § 502(a)(3) where a plaintiff proves a breach of ERISA or the plan: "When benefits are paid only after the date on which the beneficiary was entitled to receive them under the terms of the plan, the beneficiary has not received the full value of what was promised and, to the same degree, the plan has realized an unjust enrichment (assuming the lateness was unjustified). An award of interest in such circumstances serves as an equitable make-whole remedy." 277 F.3d at 229. The Second Circuit

also held that "[u]nless such a delay is justified, we see no reason why it does not constitute a breach of fiduciary duty." *Id.* at 230.[30] Hartford, however, argues that these decisions incorrectly construe ERISA and the applicable Supreme Court precedent, and that a monetary award of interest for delayed benefit payments is never "appropriate equitable relief," relying on *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), *Mertens v. Hewitt Associates,* 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), and *Great–West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).

In *Russell,* the Supreme Court considered a claim under § 502(a)(2)[31] seeking compensatory and punitive damages, brought by Doris Russell, whose short term disability benefits were discontinued when the plan administrator determined that she was no longer disabled, and then restored following subsequent examinations which supported the conclusion that Russell was indeed disabled, at which time a retroactive payment of benefits was made. 473 U.S. at 136, 105 S.Ct. 3085. Although the plan administrator paid Ms. Russell "all benefits to which she was contractually entitled," she sought relief for the injuries she allegedly suffered as a result of the improper refusal to pay benefits from the time when her benefits were terminated until they were restored.[32] According to Russell, the interruption of benefits forced her disabled husband to cash out his retirement savings which in turn aggravated the psychological condition that was the cause of her disability. *Id.* at 137, 105 S.Ct. 3085.

The Ninth Circuit concluded that Ms. Russell's complaint alleged a cause of action under ERISA § 502(a)(2), reasoning that the delay in processing the claim violated the fiduciary's obligation to process claims in good faith and in a fair and diligent manner, giving rise to a cause of action under § 409(a), 29 U.S.C. § 1109(a), which could be asserted by a beneficiary under § 502(a)(2). *Id.* at 137–38, 105 S.Ct. 3085. That court also found that the statutory language permitting "other appropriate equitable relief" was broad enough

**30.** The Seventh and Third Circuits have similarly held that interest on wrongfully delayed payments could constitute appropriate equitable relief under § 502(a)(3), *see Clair v. Harris Trust and Savings Bank,* 190 F.3d 495 (7th Cir.1999); *Fotta,* 165 F.3d 209 (3d Cir.1998), and the Eighth Circuit has impliedly recognized that a claim for interest on improperly withheld benefits based on a theory of unjust enrichment could be actionable under § 502(a)(3), *see Kerr v. Charles F. Vatterott & Co.,* 184 F.3d 938 (8th Cir.1999).

**31.** "A civil action may be brought ... by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). ERISA § 409(a), 29 U.S.C. § 1109(a) provides liability for breaches of fiduciary duty as follows:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal or such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

**32.** The claimed improprieties included: "(1) ignor[ing] readily available medical evidence documenting respondent's disability; (2) appl[ying] unwarrantedly strict eligibility standards; and (3) deliberately [taking] 132 days to process her appeal, in violation of regulations promulgated by the Secretary of Labor." *Id.* at 137, 105 S.Ct. 3085.

to encompass compensatory and punitive damages. *Id.* at 138, 105 S.Ct. 3085.

The Supreme Court reversed, holding that the remedies specifically enumerated in § 409(a) accrued solely to the benefit to the plan, rather than the individual, and that the "catchall" remedy phrase at the end could not be interpreted so broadly as to encompass the remedies for an individual beneficiary. *Id.* at 142, 105 S.Ct. 3085.

The Supreme Court declined to imply a cause of action for beneficiaries to enforce § 409(a), concluding that:

> The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.... If in this case, for example, the plan administrator had adhered to his initial determination that respondent was not entitled to disability benefits under the plan, respondent would have had a panoply of remedial devices at her disposal. To recover the benefits due her, she could have filed an action pursuant to § 502(a)(1)(B) to recover accrued benefits, to obtain a declaratory judgment that she is entitled to benefits under the provisions of the plan contract, and to enjoin the plan administrator from improperly refusing to pay benefits in the future.... In contrast to the repeatedly emphasized purpose to protect contractually defined benefits, there is a stark absence—in the statute itself and in its legislative history—of any reference to an intention to authorize the recovery of extracontractual damages. *Id.* at 146–47, 148, 105 S.Ct. 3085.

This Court recognizes the factual similarity of Ms. Russell and Dr. Dobson, but finds instructive the concurring Justices' emphasis on the fact that the Supreme Court did *not* reach the question, later presented in *Varity Corp. v. Howe,* of whether any other provision of ERISA, particularly § 502(a)(3), would provide an individual cause of action for beneficiaries seeking equitable relief for breach of fiduciary duty. *See Russell,* 473 U.S. at 139, n. 5, 105 S.Ct. 3085.[33]

Eleven years later, the Supreme Court returned to that question, and answered it in the affirmative, holding that equitable relief may be available under § 502(a)(3) for individual beneficiaries. *Varity,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130. The Supreme Court distinguished *Russell,* noting that Russell sought relief only under § 502(a)(2), and that the relief she sought was compensatory and punitive damages, rather than equitable. *Id.* at 509–10, 116 S.Ct. 1065.

The Supreme Court emphasized that

> [W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."

But that is not the case here. The plaintiffs in this case could not proceed under the first subsection because they

---

**33.** Indeed, as the *Russell* concurrence noted, "while it may be that courts generally may not find implied private remedies in ERISA, the Court's remarks have little bearing on how courts are to go about construing the private remedy that Congress explicitly provided in § 502(a)(3)." 473 U.S. at 155, 105 S.Ct. 3085 (Brennan, J., concurring). As *Russell* expressly declined reliance on § 502(a)(3), the *dicta* Hartford now relies on in support of its position that no remedy is available under ERISA for any delay in payment of benefits, *see* 473 U.S. at 144, 105 S.Ct. 3085, does not address the possibility or extent of the equitable relief available under § 502(a)(3) to redress wrongful withholding of benefits in breach of the terms of the plan or ERISA.

were no longer members of the [Plan] and, therefore, had no "benefits due [them] under the terms of [the] plan." § 502(a)(1)(B). They could not proceed under the second subsection because that provision, tied to § 409, does not provide a remedy for individual beneficiaries. They must rely on the third subsection or they have no remedy at all. We are not aware of any ERISA-related purpose that denial of a remedy would serve. Rather, we believe that granting a remedy is consistent with the literal language of the statute, the Act's purposes, and pre-existing trust law.

*Id.* at 511, 116 S.Ct. 1065.

Hartford argues that *Varity* compels denial of plaintiff's claim for unpaid interest based on its position that interest is only permissible under ERISA if it is explicitly provided by the Plan, and as plaintiff would have a claim for interest under § 502(a)(1)(B) if it were a term of the Plan, plaintiff's remedy under 502(a)(1)(B) is adequate and use of § 502(a)(3) is inappropriate. Hartford is correct that recourse to § 502(a)(3) is not necessary and thus is inappropriate where the breach of the Plan for which an equitable remedy is sought is the refusal to pay benefits (including interest) owed under the terms of a benefits plan, because § 502(a)(1)(B) then provides an adequate remedy. However, as discussed above, this Plan does *not* provide for interest payments on wrongfully withheld benefits.

Where the Plan does not provide the relief sought for a breach of the Plan as a benefit due under the terms of the Plan, which would be recoverable under § 502(a)(1)(B), the catch-all provision of § 502(a)(3) may, under appropriate circumstances, permit an equitable remedy for such a violation of the Plan. *See Clair,* 190 F.3d at 497 ("The plaintiffs also sued under section 502(a)(3)(B), however, which authorizes suits to redress plan violations,

as distinct from suits to recover unpaid benefits."). Any other reading would render meaningless the language of § 502(a)(3), allowing a beneficiary or participant to bring a claim "to obtain other appropriate equitable relief . . . to redress [violations of ERISA or the terms of the plan] or . . . to enforce any provisions of [ERISA] or the terms of the plan." Hartford's position that interest cannot be awarded under ERISA absent an express plan provision, which it relies on to arrive at the conclusion that interest can never be available under § 502(a)(3), thus begs the question whether interest on withheld benefits, or disgorgement of a fiduciary's profit on wrongfully withheld benefits, may be "equitable relief" in any circumstance.

The Supreme Court in *Mertens,* construing the phrase "other equitable relief" in § 502(a)(3), held that this phrase refers to those forms of "relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." 508 U.S. at 256, 113 S.Ct. 2063. The plaintiffs in that case sought to recover monetary relief under § 502(a)(3) from a nonfiduciary who knowingly participated in the breach of fiduciary duty, and characterized their claim as "equitable" because they sought make-whole relief traditionally available in courts of equity under the common law of trusts. *Id.* at 254–55, 113 S.Ct. 2063. Expressing doubt that ERISA was violated by the knowing participation of a nonfiduciary, the Supreme Court went on to note that plaintiffs "do not seek a remedy traditionally viewed as 'equitable,' such as injunction or restitution. Although they often dance around the word, what petitioners in fact seek is nothing other than compensatory *damages*—monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties. Money damages are, of course, the

classic form of *legal* relief." *Id.* at 255, 113 S.Ct. 2063 (emphasis in original).[34]

The Supreme Court recently revisited the issue of the scope of "appropriate equitable relief" in *Knudson.* In that case, Great–West (as an assignee of the rights of the Knudsons' medical plan) sought reimbursement from Mr. and Mrs. Knudson for the money recovered on their personal injury claims by settlement which had been paid into a trust to provide future medical care, under the terms of the plan that required the Knudsons to reimburse Great–West settlement proceeds up to the amount of medical benefits paid by the plan. 122 S.Ct. at 711. The Supreme Court held that an injunction ordering the payment of money owed under the terms of the plan was not equitable relief, observing that "petitioners seek, in essence, to impose personal liability on respondents for a contractual obligation to pay money—relief that was not typically available in equity." *Id.* at 712–13. The Supreme Court first rejected the argument that because the relief sought was cast in injunctive terms, it should be considered equitable relief, noting that typically, "specific performance of a contract to pay money was not available in equity." *Id.* at 713.

More significant for the purposes of the present dispute, the Supreme Court then went on to reject the argument that because the relief sought was restitutionary, it was appropriate equitable relief. First, the Supreme Court recognized that "not all relief falling under the rubric of restitution is available in equity. In the days of the divided bench, restitution was available in certain cases at law, and in certain others in equity." *Id.* at 714. Where a plaintiff sought only " 'to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money,' " the claim was considered legal, essentially an action at law for breach of contract or implied contract. *Id.* (*quoting* Restatement of Restitution § 160, Comment a, pp. 641–42 (1936)). "In contrast, a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* The Supreme Court rejected Great–West's efforts to characterize the relief it sought as equitable, noting that "the [trust] funds to which petitioners claim an entitlement under the Plan's reimbursement provision— the proceeds from the settlement of respondents' tort actions—are not in respondents' possession.... The basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to *some* funds for benefits that they conferred." *Id.* at 715.

The Supreme Court also recognized the availability of an accounting for profits, another equitable remedy based on avoiding unjust enrichment. Where "a plaintiff is entitled to a constructive trust on particular property held by the defendant, he

---

**34.** Since *Mertens,* courts, including the Second Circuit, have routinely rejected claims for money damages under § 502(a)(3). *See, e.g., Lee v. Burkhart,* 991 F.2d 1004, 1011 (2d Cir.1993) ("Money damages are generally unavailable under this section."). However, where the relief sought is equitable, the fact that the form of relief is monetary does not automatically preclude recovery under § 502(a)(3). *See Clair,* 190 F.3d at 498

("ERISA does not entitle a plan participant or beneficiary to seek *damages* (other than unpaid benefits) for a violation of the terms of the plan, and the plaintiffs here are seeking money. But not all monetary relief is damages. Equity sometimes awards monetary relief, or the equivalent, and restitution is both a legal and equitable remedy that is monetary yet is distinct from damages.") (citations omitted, emphasis added).

may also recover profits produced by the defendant's use of that property even if he cannot identify a particular *res* containing the profits sought to be recovered." *Knudson*, 122 S.Ct. at 715 n. 2. "Unlike the [constructive] trust, ... an accounting does not seek any particular *res* or fund of money; the defendant will be forced to yield up profits, but the defendant can pay from any monies he might have, not some special account." 1 Dan B. Dobbs, *Law of Remedies*, § 4.3(2), at 588 (2d Ed.1993). When sought against a fiduciary, an accounting for profit "forces the fiduciary defendant to disgorge gains received from improper use of the plaintiff's property or entitlements." *Id.* § 4.3(5), at 610.

Plaintiff acknowledges that the Second Circuit's holding in *Dunnigan* that interest is appropriate as make-whole equitable relief is called into question, if not expressly overruled, by the *Knudson* decision, and has recast his claims so that he is no longer seeking interest as make-whole equitable relief.[35] The hotly-contested issue before this Court, then, is whether a restitutionary remedy of a constructive trust or an accounting of profits to prevent unjust enrichment by Hartford remains "appropriate equitable relief" after *Knudson.*

Defendant asserts that plaintiff's claim is "nothing more than a claim for money damages to compensate for the lost time value on the benefits Hartford withheld. Such a claim is legal, and is simply not available under § 502(a)(3)." Def. Supp. Br. at 3. Defendant characterizes the relief sought as "legal restitution," claiming that plaintiff cannot identify a particular fund or property in possession of the defendant, which in good conscience belongs to him, but instead seeks to obtain a judgment imposing personal liability upon Hartford

to pay a sum of money. Thus, Hartford argues, the relief sought here is indistinguishable from that at issue in *Knudson.*

■ As the Supreme Court noted, a constructive trust is an equitable remedy designed to permit recovery of identifiable property rightfully belonging to plaintiff. *See Knudson*, 122 S.Ct. at 714; 1 Dan B. Dobbs, *Law of Remedies*, § 4.3(1), at 587 (2d Ed.1993). "If no particular property is identified as belonging to the plaintiff in equity and good conscience, the plaintiff's claim for money restitution looks like an ordinary claim for a money judgment. In that case, the claim seems to be legal by ordinary standards." *Id.* § 2.6(3), at 157.

Plaintiff here claims that his property, in the form of his monthly LTD benefits, was wrongfully withheld by Hartford for a period of time after he had submitted satisfactory proof of disability, during which time Hartford had that asset in its possession, and he seeks either a constructive trust on the proceeds earned by his benefits or an accounting for profits to require Hartford, as a fiduciary, to disgorge its profits. *Cf. Juliano v. Health Maintenance Org. of New Jersey, Inc.*, 221 F.3d 279, 292 (2d Cir.2000) (denying § 502(a)(3) claim for restitution of denied medical benefits because plaintiff had failed to show that the defendant was wrongfully in possession of the funds not expended on the medical benefits). While the fact that Dobson labels his claim as one for disgorgement of profits to prevent unjust enrichment rather than a legal remedy will not automatically convert a legal claim into one for equitable relief, the nature of the relief sought here, combined with the allegations of claims handling by Hartford that breached its fiduciary duty, ERISA

---

**35.** While *Dunnigan* was issued after *Knudson,* the *Dunnigan* decision does not cite to or discuss *Knudson.* Because there was less than twenty-four hours between the issuance

of two decisions, the Second Circuit does not appear .to have considered the impact of *Knudson* on the continuing viability of the precedent it relied upon.

regulations and the terms of the LTD Plan itself, convince the Court that this is an equitable claim for unjust enrichment rather than a legal claim for interest as compensatory relief.[36]

Two years after plaintiff began receiving disability benefits, an interoffice memorandum reflects that Hartford was aware that because Dr. Dobson's "occupation will always be considered to be an Anesthesiologist, ... [a]ssuming he will never be able to return to work as an Anesthesiologist, the only way to get him off claim would be through a settlement." [37] Then, two years later, although it received no information that there had been any change in plaintiff's medical condition, Hartford informed plaintiff that his proof of disability was unsatisfactory because "it is unclear from the review of [the documents submitted by plaintiff's treating physician] that Dr. Murdy has performed a physical exam or performed any tests to document your condition and/or level of impairment," and advised plaintiff that his benefits had been suspended and that he had thirty days to submit additional information.[38] However, a note in the file dated April 21, 1997, alleged by plaintiff to have been prepared by a nurse examiner for Hartford, concluded that although plaintiff's diagnostic testing showed minimal abnormalities, the "life and death" nature of his work as an anesthesiologist and the hours of that job "would recommend he would not be able to sustain awake hours that are required of an anesthesiologist. I really don't see this condition improving without treatment and he has failed treatment." [39]

Notwithstanding this diagnosis, and without any additional consultation with any medical professional, Hartford continued to withhold benefits, maintaining that a current physical examination or "appropriate testing" was required, but rejecting plaintiff's doctor's position that due to the nature of plaintiff's disability, "appropriate testing" had already been performed and there was no need for further sleep studies or testing. Moreover, based on its position that benefits had not been "denied" but were merely "suspended," Hartford refused to provide plaintiff with the documentation necessary for him to proceed with his administrative appeal, thus making it difficult for plaintiff to determine the basis for Hartford's denial of his claim, and to respond with appropriate medical evidence. When plaintiff did undergo a new sleep study in September of 1997, at a clinic to which he was referred by his treating physician, Hartford initially refused to credit the conclusions of that study based on its independent medical examiner's faulty position that Dr. doPico and the University of Wisconsin Sleep Clinic were not properly accredited, and informed plaintiff in November 1997 that his failure to submit "a multiple sleep latency test or maintenance of wakefulness test" rendered his proof of loss insufficient. Eventually, faced with unrefuted evidence that Dr. doPico and the sleep clinic were accredited and that plaintiff remained disabled, Hartford reinstated plaintiff's benefits in April 1998. While the Court recognizes that Hartford has not had an opportunity to come forward with

**36.** Although Hartford states that it disputes plaintiff's account of the handling of his claim, it moves for summary judgment only on whether the relief sought by plaintiff is available as a matter of law under § 502(a)(3), and thus has not submitted any evidence contradicting plaintiff's account. Accordingly, the facts set forth below reflect plaintiff's version of the events.

**37.** HART 5891 (March 10, 1995 Memorandum to Andrea Meyer from Paul McTague).

**38.** HART 5848 (April 7, 1997 Letter from Dana Baiocchi to Douglas Dobson).

**39.** HART 5830–31 (April 21, 1997 Memo).

evidence rebutting plaintiff's account of the handling of his claim, these facts, if proved, could support a claim for unjust enrichment based on Hartford's wrongful withholding of benefits.

As noted, an accounting for profits is available to force the fiduciary to disgorge the gains it received from the improper use of the plaintiff's property. While an accounting for profits is available only where a particular fund can be identified, plaintiff's monthly LTD benefits, while wrongfully in Hartford's possession, constitute a sufficiently identifiable property to permit plaintiff to recover the gains Hartford realized on those funds in an accounting for profits. Further, as noted by the Supreme Court, an accounting is particularly appropriate in circumstances where, as here, plaintiff can no longer identify a particular fund in which the profits are contained over which a constructive trust might be exercised. *See Knudson,* 122 S.Ct. at 715 n. 2.

Further supporting the Court's conclusion that the relief sought here is "appropriate equitable relief" is the fact that the conduct alleged here is a breach of fiduciary duty, rather than a breach of contract. While the Court recognizes that the Su-

preme Court has made clear that equitable relief under § 502(a)(3) does not mean all relief available for a breach of trust at common law, but instead only " 'those categories of relief that were typically available in equity,' " *Knudson,* 122 S.Ct. at 718 (*quoting Mertens,* 508 U.S. at 256, 113 S.Ct. 2063), the relief sought by plaintiff here *was* typically available in equity, and is being sought in a case that could *only* have gone forward in equity. *See* 1 Dan B. Dobbs, *Law of Remedies,* § 4.3(5), at 613 ("The fiduciary accounting for profits was traditionally an equitable claim.").[40]

The Seventh Circuit also has concluded that restitution in the form of interest on wrongfully withheld benefits is equitable when based on an alleged breach of trust or unjust enrichment, because it is an equitable remedy sought in an equitable case. *See Clair,* 190 F.3d at 498 ("restitution is equitable when sought by a person complaining of a breach of trust" and noting that "a constructive trust is an equitable remedy commonly sought and granted in cases of unjust enrichment"). Similarly, the Eighth Circuit in *Kerr* appears to have recognized that a claim for the time value of money wrongfully withheld based on unjust enrichment could properly be considered restitutionary "equitable relief." *Kerr,* 184 F.3d at 944–45.[41] While *Knud-*

---

**40.** Although plaintiff pleads his claims in the alternative, the § 502(a)(1)(B) contractual claim rests on a sufficiently strained interpretation that the Court is persuaded that here, unlike *Knudson,* the claim is not one in essence seeking an imposition of personal liability for a contractual obligation to pay money dressed up in equitable terms, but rather is seeking traditional equitable relief to prevent a fiduciary from profiting from its alleged wrongdoing. *See Amalgamated Clothing & Textile Workers v. Murdock,* 861 F.2d 1406, 1412 (9th Cir.1988) ("the imposition of a constructive trust on a fiduciary's ill-gotten profits in favor of all plan participants and beneficiaries is an important, appropriate, and available form of relief under ERISA § 409(a), particularly when it is the only means of denying a fiduciary ill-gotten

profits that flow from the breach of his duty of loyalty"); *Clair,* 190 F.3d at 498 (noting that defendant's position that interest is never available, even where benefits have been wrongfully withheld, would leave "a big gap in ERISA's remedial scheme").

**41.** The court there ultimately determined that the plaintiff's claim for a monetary award of the difference between the amount he allegedly could have earned on 401(k) funds wrongfully withheld for three and a half years and the return that the pension plan earned during that period was impermissible under § 502(a)(3) because properly cast as "compensatory" rather than "equitable," as plaintiff had received the interest earned by the plan during that period and the plan therefore had not been unjustly enriched. *Id.*

*son* has narrowed the scope of relief available under § 502(a)(3), the Court does not find that it has impliedly overruled the reasoning underlying these decisions, and concludes that a constructive trust and/or accounting for profits remains available equitable relief under ERISA § 502(a)(3).[42]

That does not end the inquiry, of course, because to recover under § 502(a)(3), plaintiff must also prove that the equitable relief sought is necessary to redress either a violation of ERISA or the terms of the Plan. Hartford has not moved for summary judgment on the ground that there is no underlying breach, and plaintiff has articulated conduct which, if proved, could support a finding of liability under § 502(a)(3) and recovery of "appropriate equitable relief."

Plaintiff claims that Hartford violated the terms of the Plan by purporting to "suspend" his benefits effective March 31, 1997 rather than denying the claim outright, which would have permitted plaintiff to obtain the basis for Hartford's decision and prepare his request for review. Moreover, in reliance on the characterization of the benefits as "suspended," Hartford refused to provide documentation requested by plaintiff's counsel and did not provide plaintiff with information about appeal procedures, allegedly in violation of the terms of the Plan.

In addition, plaintiff claims that Hartford breached its fiduciary duty by unjustifiably withholding his benefits for nearly thirteen months. Plaintiff maintains that Hartford summarily denied him benefits in April 1997, based on no new medical evidence or evaluation, and then inexplicably delayed reinstating benefits despite the fact that Hartford's own nurse evaluator determined that plaintiff was disabled under the terms of the plan three weeks after it terminated his benefits, and despite the absence of any good faith basis for maintaining that plaintiff was not disabled from his occupation. These claims, if proved, could demonstrate a violation of the duty of loyalty owed by defendant as fiduciary to plaintiff as plan participant.

Thus, to the extent plaintiff can establish a breach of ERISA or the Plan, a necessary precondition for obtaining equitable relief under § 502(a)(3), the Court concludes that he is not barred as a matter of law from recovering such monetary relief as would prevent unjust enrichment resulting from the breach of duty. Therefore summary judgment on the grounds sought by Hartford on plaintiff's individual § 502(a)(3) claim is denied.

## V. Conclusion

The goals of ERISA have been described by the Second Circuit as "ambitious":

---

**42.** Hartford relies on *Blue Cross Health Services, Inc. v. Sauer*, 800 S.W.2d 72, 76 (Mo.Ct. App.1990) in support of its position that the non-payment of insurance benefits cannot give rise to a constructive trust or disgorgement of profits. *Sauer* involved an erroneous payment of benefits by the insurer, which sought to recover the money it had paid. In determining whether the claim was equitable to assess whether it should have been tried to a jury or by bench trial, the court found that the relief sought was legal restitution because "appropriate action when one party has been unjustly enriched through the mistaken payment of money by the other party is an action at law for money had and received." *Id.* Noting that equitable relief is available only where there is no adequate remedy at law, the court rejected the claim for a constructive trust because Blue Cross did not allege the "existence of specific property or fund constituting the res upon which the trust might be imposed." *Id.* Here, in contrast, there is no adequate remedy at law, and the Court finds that Dr. Dobson's benefits, if proved to be wrongfully held in Hartford's possession for some period of time, constitute a sufficiently identifiable asset to support a claim for accounting of profits in equity.

Faced with a patchwork of varying state law governing the rights and responsibilities of pension plans, fiduciaries, beneficiaries and participants, Congress sought to establish minimum standards of fiduciary conduct, to improve the equitable character and soundness of private pension plans, and to provide "for appropriate remedies ... and ready access to the Federal courts."

*Strom*, 202 F.3d at 145 (citation omitted). The Court holds today that a fiduciary is not required to pay the time-value of withheld benefits where the delay in payment is not the result of a breach of either the terms of the plan or of any ERISA provision, including a breach of fiduciary duty. However, the Court also recognizes that where a beneficiary proves that the fiduciary did wrongfully withhold disability benefits in violation of ERISA or the plan, the fiduciary may properly be compelled to give up its ill-gotten gain as appropriate equitable relief. This approach serves the purposes of ERISA by both prohibiting fiduciaries from taking advantage of their position to improperly withhold benefits for their own profit, and discouraging dilatory plaintiffs whose own acts caused the delay in payment.

For the reasons set forth above, plaintiff's motion for partial summary judgment [# 47] is DENIED, and his motion for class certification [# 53] is DENIED AS MOOT.[43] Defendant's motion for summary judgment on the § 502(a)(3) claim relating to the *ex gratia* "policy" [# 75] is GRANTED. Defendant's motion for summary judgment [# 57] is GRANTED IN PART and DENIED IN PART as follows: the motion is granted on the § 502(a)(1) claim

for interest and denied on the § 502(a)(3) claim for interest as an individual claim.

IT IS SO ORDERED.

---

**43.** In light of the Court's ruling on all plaintiff's claims asserted as class claims, plaintiff's

motion for class certification is moot [# 53].