**Helen DUNNIGAN, on behalf of herself and all others similarly situated, Plaintiffs,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

No. 99 Civ. 4059(SAS).

United States District Court, S.D. New York.

Jan. 2, 2003.

---

Scott M. Riemer, Michael E. Schoeman, Schoeman, Updike & Kaufman, LLP, New York City, for Plaintiff.

Myron D. Rumeld, Allan M. Marcus, Proskauer Rose LLP, New York City, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

Helen Dunnigan is a beneficiary of a long-term disability ("LTD") insurance policy issued by Metropolitan Life Insurance Company ("MetLife"). Dunnigan brings this action

on behalf of herself and all other similarly situated participants of a MetLife disability policy, pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to recover interest on disability benefit payments received retroactively from MetLife. Dunnigan claims that MetLife's delay in payment of those benefits deprived recipients of the time value of their money.

In November 1999, MetLife moved to dismiss the complaint, arguing that claims for interest on delayed benefits cannot be maintained under ERISA. On March 8, 2000, this Court held that interest on delayed plan payments may be sought under section 502(a)(3)(b) of ERISA, which permits beneficiaries to seek equitable relief for plan violations, but that Dunnigan had not alleged an essential element of a claim under that section—bad faith—and therefore failed to assert a claim upon which relief could be granted. *See Dunnigan v. Metropolitan Life Ins. Co.*, 99 F.Supp.2d 307, 323 (S.D.N.Y.2000), *vacated*, 277 F.3d 223 (2d Cir.2002). This Court further held that any such action requires an individualized assessment of the facts and equities surrounding each claim and thus cannot be maintained on behalf of a class of plaintiffs. *See id.* at 325–26.

The Second Circuit affirmed this Court's ruling that claims for recovery of interest may be brought under section 502(a)(3)(b), but held that plaintiff need only allege that her payments were "unreasonably delayed"—not that the insurer acted in "bad faith"—to state a claim for equitable relief under this section. *See Dunnigan*, 277 F.3d at 229–30. As a result, the Second Circuit vacated this Court's dismissal of Dunnigan's claims and denial of class certification, and remanded for reconsideration of the issue of class certification, to which it "intimate[d] no view." *Id.* at 231–32.

In response to the Circuit's decision, Dunnigan amended her class action complaint and now moves to certify, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class consisting of all beneficiaries of an LTD plan insured by MetLife, whose claims for benefits were approved more than ninety days after they were submitted and who did not receive written notice of "special circumstances" requiring an extension of time to render a determination. Dunnigan makes several creative arguments, drawing on other areas of the law, to convince this Court that the claims of the putative class members present a common theory of liability that outweighs individual issues.

For the reasons set forth below, the assessment of the reasonableness of MetLife's delay, like the analysis of whether MetLife acted in bad faith, cannot be adjudicated on a class-wide basis, without evaluation of the unique facts and circumstances of each class member's individual claim. Accordingly, Dunnigan's motion for class certification is again denied.

## II. FACTUAL BACKGROUND

### A. LTD Plan Provisions

Deloitte & Touche ("Deloitte") provides its employees with LTD benefits through a plan issued by MetLife (the "Deloitte Plan" or the "Plan"). *See* Second Amended Class Action Complaint ("SAC"), Ex. A to Affirmation of Scott M. Riemer, plaintiff's attorney ("Riemer Aff."), ¶ 4. The Deloitte Plan is an employee welfare benefit plan within the meaning of section 3(1) of ERISA, 29 U.S.C. § 1002(1). *See id.* ¶ 4. With respect to the Deloitte Plan, MetLife is a "fiduciary" within the meaning of section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). *See id.* ¶ 7.

All of the terms and conditions of MetLife's coverage of the Plan, including the time-frames for adjudicating claims specified in the Department of Labor ("DOL") regulations,[1] are set forth in a Certificate of Insur-

---

1. 29 C.F.R. § 2560.503–1(f)(1), formerly 29 C.F.R. § 2560.503–1(e)(3), provides in pertinent part: "If a claim is wholly or partially denied, the plan administrator shall notify the claimant ... of the plan's adverse benefit determination within a reasonable period of time, but not later than 90 days after receipt of the claim by the plan, unless the plan administrator determines that special circumstances require an extension of time for processing the claim. If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90-day

ance ("Certificate" or "Ins. Cert.").[2] *See* Ins. Cert., Ex. B to Affidavit of Laura Sullivan, business consultant for MetLife ("Sullivan Aff."). The Certificate identifies Deloitte as the plan administrator. *See* Ins. Cert. at 14. As the plan administrator, Deloitte is responsible for preparing a summary plan description ("SPD") and distributing it to plan participants. *See* Sullivan Aff. ¶ 17.

MetLife has produced two documents that it claims are Deloitte's SPD. *See* Long Term Disability Benefits: Choices to Balance Your Disability Needs, revised July 1994 ("7/94 SPD"), Ex. C to Sullivan Aff;[3] Long Term Disability Benefits, March 1998 Edition ("3/98 SPD"), Ex. A to Riemer Rep. Aff. Only one of the two documents—the July 1994 version—provides notice of the time-frames specified in the DOL regulations.[4] *See* 7/94 SPD at 8.3 (providing "In the event your claim has been denied in whole or in part, you or your authorized representative should receive, within 90 days, a written notice stating the basis of the denial (or 180 days if there exist circumstances beyond the Plan Administrator's control)."). The time limits are not described in the acknowledgment letters sent to claimants after they submit a notice of claim or proof of claim. *See* Acknowledgment Letter 1: Initial Claim Acknowledgment; Ex. J to Riemer Aff.; Acknowledgment Letter 2: Predetermination Letter, Ex. K to Riemer Aff.

Under the Deloitte Plan, payment of LTD benefits commences upon completion of a ninety day "elimination period" following the onset of an employee's disability. *See* Ins. Cert. at 2, 5. The Plan specifically provides that: (i) "When we receive proof that you are Disabled, we will pay a Monthly Benefit in accordance with the Schedule of Benefits." *Id.* at 6; (2) "[Written p]roof [of a claim] must describe the event, the nature and extent of the cause for which a claim is made; it must be satisfactory to us." *Id.* at 9; (3) "If the written proof of a claim: (a) has been made on time; and (b) is satisfactory to us; we will pay the accrued benefits monthly at the end of the period for which they are due." *Id.*

A claim is considered timely if received not later than ninety days following the end of the elimination period. *See id.* The Plan makes no express provision for the payment of interest on delayed or retroactive awards of benefits. *See* Sullivan Aff. ¶ 15.

## B. MetLife's Claim Procedures

MetLife maintains a number of procedures designed to assure that LTD benefit determinations are made in a timely fashion, in advance of the ninety and sixty day time periods set forth in the regulations. *See* Deposition of Laura Sullivan ("Sullivan Dep."), Ex. A to Affidavit of Allan M. Marcus, defendant's attorney ("Marcus Aff."), at

---

period. In no event shall such extension exceed a period of 90 days from the end of such initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the benefit determination."

2. As of January 1, 2002, MetLife amended its Certificate to include sections describing the time-frames specified in the DOL regulations. *See* Claims Information Rider to Certificate ("Cert.Rider"), Ex. C to Reply Affirmation of Scott M. Riemer ("Riemer Rep. Aff.").

3. Dunnigan argues that the July 1994 version of Deloitte's SPD is inadmissible because it was never produced during discovery, although duly demanded. *See* Riemer Rep. Aff. ¶ 3. The only document allegedly produced by MetLife was the March 1998 edition, which Dunnigan argues "evidently supercede[s] the document MetLife now represents [to be] the SPD." *See id.* ¶¶ 4, 5. Because Dunnigan was not prejudiced as a result

of MetLife's delayed production of the SPD, there is no reason to preclude its admission.

4. Dunnigan additionally contends that neither the July 1994 nor the March 1998 plan summary is the official SPD within the meaning of 29 C.F.R. § 2520.102, because MetLife viewed its Certificate as the SPD, not the summary that was drafted by Deloitte. *See* Riemer Rep. Aff. ¶¶ 6, 7 (citing language in MetLife's internal claim manual that describes the "SPD" as the "booklet or *booklet-certificate* distributed to plan participants/employees which describes the main provisions of the Plan"). The use of the word "booklet-certificate" in the description of the SPD is insufficient by itself to suggest that MetLife considered its Certificate of Insurance to be the official SPD. *See also* Contract between Deloitte and MetLife, Ex. B to Riemer Rep. Aff., at 5 (describing MetLife's responsibility to furnish a "certificate," not an SPD, which "state[s] the insurance protection to which the Employee is entitled").

99–101, 119–20, 140; *see also* Sullivan Aff. ¶¶ 3–9. All claims from a particular employer-group are handled by one claim team of case managers under the supervision of a unit manager. *See* Sullivan Aff. ¶ 4. A case manager is assigned to the claim within twenty-four hours after the notice of claim is received. *See id.* ¶ 5. Case managers generally are in on-going telephonic communications with Plan participants in order to advise the participants of the status of their claims and to assure that all required information is received. *See id.* ¶ 6; Sullivan Dep. at 18, 119–20, 130–32, 140.

Case managers receive a weekly report of pending claims broken down into various time-frames, including how long the claim has been pending. *See* Sullivan Aff. ¶ 7. Unit managers monitor these claim reports to ascertain whether they are being handled in a timely manner. *See id.* Case managers have the ability to track requests for claims information to assure that the information is timely received, and if not, that the follow-up request is timely made. *See id.* ¶ 8.

Claims personnel receive classroom and on-the-job training regarding the claims procedure and are provided with a reference manual entitled "Claim Management Guidelines" ("CMG"). *See id.* ¶ 9. The CMG contains instructions regarding the need to maintain ongoing contact with claimants about the status of their claims and expected time-frames for the completion of various tasks related to claims processing. *see* CMG, Ex. A to Sullivan Aff., at VII–2. The CMG provides, among other things:

> MetLife must render a claim determination to either pay benefits or deny benefits within **90 days** of receipt of the claim unless special circumstances require an extension of time for processing the claim. If there are special circumstances, MetLife must give the claimant a written notice of the need for an extension of time to renew the claim; and in that notice, we must state what facts or needs form the basis for the extension and give a date by which

we expect to complete our final decision. In no case can the extension of time be greater than 90 days from the end of the initial 90–day period.

*See id.* at Appendix ("App.") H1–3 (emphasis in original).

During the period 1999–2001,[5] MetLife approved approximately 21,790 LTD claims, 19,438 of which, or 89.2%, were determined within ninety days of receipt of the original application or an appeal from a timely denial. *See* 1999–2001 MetLife Spreadsheet ("Spreadsheet"), Ex. B to Riemer Aff. Thus, for the years 1999, 2000 and 2001, approximately 2,352 individuals met the class criteria. *See* Riemer Aff. ¶¶ 3, 5. Dunnigan estimates, by statistical extension, that the number of class members from June 4, 1993 to the filing of the instant motion is approximately 6,700. *See id.* ¶ 3. A more precise analysis of the time-frames for approving LTD claims during other time periods relevant to this litigation can be achieved by comparing important dates recorded on an overview screen of MetLife's new computer system. *See* Printout of "Overview–Important Dates" Screen, Ex. E to Riemer Rep. Aff. (providing the "Date Files Complete," "Date Declined" and "Date Approved").

The reasons why a determination may not be made within the specified time-frames include: the failure of a claimant or her physician to provide requested information in a timely fashion; the need for additional information from the claimant or physician; the need to conduct a medical examination or evaluation of the claimant; the failure of a claimant to appear for an independent medical examination (IME) or functional capacity evaluation (FCE); and the inability to schedule an IME or FCE within the ninety day period. *See* Sullivan Aff. ¶ 11.

MetLife does not routinely send written extension notices to claimants within ninety days of the submission of a claim. *See* Defendant's Response to Plaintiff's Request for Production of Documents, Ex. E to Riemer

---

5. MetLife claims that it is unable to generate a statistical report for years prior to 1999 because of a conversion of its computer system from the UDS system to the Intellis system. *See* Sullivan Aff. ¶ 10 n. 1. However, Sullivan testified at her deposition that both systems are accessible to case managers and that the information contained in the two systems is duplicative. *See* Sullivan Dep., Ex. D to Riemer Rep. Aff., at 22–23.

Aff., at 6 (admitting "letters that explicitly stated that MetLife was extending by 90 days the time in which to make an initial claim determination ... were not routinely sent to claimants in advance of the expiration of the initial 90–day period following receipt of the claim"); *see also* 7/22/02 Letter to Riemer from Allen M. Marcus, Ex. F to Riemer Aff., at 2 (referring to defendant's prior responses to document requests when asked for supplemental letters communicating the ninety day time-frame provided for in the regulations. Claimants are generally made aware of the reasons for any delay during their conversations with case managers. *See* Sullivan Aff. ¶ 11; Sullivan Dep. at 131, 133.

## C. Dunnigan's Claim for Benefits

In October 1990, Dunnigan began employment as an auditor at the New York office of Deloitte. *See* SAC ¶ 15. Dunnigan enrolled in the Deloitte Plan and was at all relevant times a Plan "participant" within the meaning of section 3(7) of ERISA, 29 U.S.C. § 1002(7). *Id.*

In March 1994, Dunnigan was diagnosed with Chronic Fatigue Syndrome ("CFS") and was rendered totally disabled by the disease. *See id.* ¶ 16. In early July 1994, Dunnigan applied to MetLife for long-term disability benefits. *See id.* ¶ 17; LTD Claim for Dunnigan ("Claim"), Ex. D to Sullivan Aff., at ML000530–39. On July 27, 1994, MetLife sent a checklist to Dunnigan, requesting additional information, such as a medical authorization, social security authorization, LTD reimbursement agreement, and list of treating physicians. *See* Sullivan Aff. ¶ 21; Claim at ML000528–29. Dunnigan did not receive the checklist until several months later because the mail was returned to MetLife several times as "undeliverable," *see* Sullivan Aff. ¶ 21; Claim at ML000518–20, and there-

fore did not respond until October 19, 1994. *See* Claim at ML000512–17, 521.

In mid-September 1994, MetLife received the additional medical information it had requested from two of Dunnigan's doctors, *see id.* at ML000480–98, 475–78, and sent the file for an independent physician's file review ("PFR"), *see id.* at ML000475–78. Dr. J. Freeman, the reviewing physician, advised that the diagnosis of CFS could not be confirmed, and that the medical information indicated Dunnigan's functional capacity was consistent with past work demands. *See id.* at ML000470–73. In late September 1994, Dr. Freeman's report was sent to Dunnigan's treating physicians for their comments, which were received in late October. *See id.* at ML000468–69, 462–64.

On November 9, 1994, a MetLife Unit Supervisor denied Dunnigan's claim, upon Dunnigan's case manager's recommendation. *See id.* at ML000461. On November 15, 1994, approximately 125 days after Dunnigan had filed her application, Dunnigan was informed by letter that her application for benefits had been denied. *See id.* at ML000458–60. MetLife did not provide written notice to Dunnigan informing her that there were special circumstances requiring an extension of the ninety day limitations period specified by the DOL regulations. *See* SAC ¶ 19.

On February 15, 1995, Dunnigan appealed MetLife's denial of benefits. *See id.* ¶ 21. By letter dated August 2, 1995, MetLife denied Dunnigan's appeal and stated that Dunnigan could bring no further appeals. *See id.* ¶ 23. MetLife's denial of Dunnigan's appeal was issued approximately 165 days after she had filed her appeal. Again, MetLife did not provide written notice to Dunnigan informing her that there were special circumstances requiring an extension of the sixty day limitations period specified by the DOL's regulations.[6] *See id.* ¶ 22.

---

6. 29 C.F.R. § 2560.503–1(i)(1), formerly 29 C.F.R. § 2560.503–1(f)(1), provides "... the plan administrator shall notify a claimant ... of the plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances (such as

the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim. If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 60–day period. In no event shall such extension exceed

In September 1997, Dunnigan retained counsel and submitted additional appeals to MetLife, all of which were denied. *See* Sullivan Aff. ¶¶ 29–30; Claim at ML000141, 125–29. Then, in February 1999, MetLife reversed its denial of plaintiff's disability benefits and granted plaintiff retroactive benefits for the period from June 23, 1994 through January 31, 1999. *See* Claim at ML001095–96, 1–3. MetLife tendered those retroactive benefits in a lump sum payment by check dated February 8, 1999. *See* SAC ¶ 27. The lump sum amount was calculated by multiplying Dunnigan's monthly benefit, as specified under the terms of the Deloitte Plan, by the number of months from the date of entitlement—here, June 23, 1994. *Id.* ¶ 8(e).

As a matter of company policy, MetLife did not pay Dunnigan any interest on her retroactive benefits. *Id.* ¶ 28. MetLife informed Dunnigan's counsel that "regardless of the factual circumstances[,] MetLife never pa[ys] interest on back benefits except when ordered to do so by a court of law." *Id.* ¶ 29.

## III. PROCEDURAL HISTORY

### A. Class Action Complaint

This action was commenced by a class action complaint filed June 4, 1999. Dunnigan filed an amended class action complaint on September 29, 1999. *See* First Amended Complaint ("FAC"). In the complaint, Dunnigan seeks to represent a proposed class of persons who:

 (a) were covered by a policy of long-term disability insurance issued by MetLife, *id.* ¶ 8(a);

 (b) were determined by MetLife, after a period of delay, to be totally disabled and entitled to disability benefits, *id.* ¶ 8(b);

 (c) were paid retroactive benefits in a lump sum by MetLife, *id.* ¶ 8(c); and

 (d) were not paid interest on those retroactive benefits, *id.* ¶ 8(d).

Dunnigan contends that she and the purported class members are automatically entitled to an award of interest on their retroactive benefits, with such interest running from the effective date of the award or, alternatively, from the expiration of the time period that federal regulations prescribed for responding to benefit claims. *See id.* ¶¶ 36, 39–40, 46.

The Complaint sets forth four alternate claims for relief. Claim I seeks an award of interest as a matter of plan interpretation pursuant to section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). *Id.* ¶¶ 29–36. Claims II and III seek equitable relief pursuant to section 502(a)(3)(B) of ERISA, 29 U.S.C. § 1132(a)(3)(B). *Id.* ¶¶ 37–48.[7] Claim IV seeks payment of attorneys' fees and costs pursuant to section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1). *Id.* ¶¶ 49–50.

MetLife answered the complaint and amended complaint on August 16, 1999 and October 6, 1999, respectively. After limited discovery, MetLife filed a motion to dismiss the complaint.

### B. Motion to Dismiss

#### 1. Claim Under Section 502(a)(1)(B)

This Court dismissed Dunnigan's section 502(a)(1)(B) claim, which charges MetLife with failing to perform its implied contractual obligations to pay interest on unreasonably delayed claim payments, holding that the right to recover interest was neither an express nor an implied term of the Plan. *See Dunnigan,* 99 F.Supp.2d at 316–19. The Second Circuit specifically declined to address this holding because it held that Dunnigan had asserted a valid claim for relief under section 502(a)(3). Accordingly, because this claim has been dismissed, there can be no class certification on this claim.

a period of 60 days from the end of the initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the determination on review."

**7.** Specifically, Claims II and III seek monetary restitution in an amount equal to the "interest withheld by MetLife on the Retroactive Benefits

paid to plaintiff and each class member," *see* FAC at *ad damnum* clause, ¶¶ B(2)(a), C(2)(a), and/or "disgorgement of the profits MetLife earned by withholding interest on the Retroactive Benefits," *see id.* at ¶¶ B(2)(b), C(2)(b). Claims II and III also seek various declaratory judgments. *See id.* at ¶¶ B(1), C(1).

## 2. Claims under Section 502(a)(3)

With respect to Dunnigan's claim under section 502(a)(3), this Court held that there is an implied cause of action for breach of the covenant of good faith and fair dealing. The Second Circuit agreed. Nevertheless, this Court dismissed this claim because the complaint "gives no indication as to who caused the delay in payment or whether such delay was a result of bad faith by either party." *Dunnigan*, 99 F.Supp.2d at 326.

The Second Circuit vacated the dismissal of Dunnigan's section 502(a)(3) claim on the ground that such a claim does not require proof of bad faith. *See Dunnigan*, 277 F.3d at 229–30. The Circuit found instead that "[u]nless such a delay is justified, [it] sees no reason why [delayed payment of benefits] does not constitute a breach of fiduciary duty." *Id.* at 230. Thus, MetLife must justify its delay in order to avoid a finding that it breached its fiduciary duty. The Circuit suggested that "the ninety-day period specified by the regulations of the Secretary of Labor ... for making [such] determinations, defines the duration of the reasonable period during which the Plan is not chargeable with an interest obligation." *Id.* at 231.

## C. Second Amended Complaint

On January 30, 2003, Dunnigan filed a Second Amended Complaint, in response to the Circuit's decision. MetLife filed its answer on February 19, 2002. MetLife and Dunnigan thereafter conducted discovery limited to the class allegations. On July 31, 2002, Dunnigan filed the instant motion, seeking to certify a more narrowly defined class that includes only those recipients of retroactive LTD benefits for whom "MetLife failed to render its initial determination within ninety days from the date the claim was received (the 'Received Date')" and "MetLife failed to furnish [ ], within ninety days from the Received Date, with a written notice indicating special circumstances requiring an extension of time as required by 29 C.F.R. § 2560.503–1(e)(3)." *See* Memorandum of Law in Support of Plaintiff's Motion for Class Certification ("Pl.Mem.").

## IV. STANDARD FOR CLASS CERTIFICATION

Rule 23 of the Federal Rules of Civil Procedure sets forth the requirements for bringing and maintaining a class action in federal court. *See* Fed.R.Civ.P. 23; *see also infra* Part V. " 'In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.' " *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 (2d Cir.2001) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). While this Circuit has "directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation," *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 504 (S.D.N.Y. 1996) (citing *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208–09 (2d Cir.1972)), a court may not grant certification unless it is satisfied, after " 'rigorous analysis,' " that the criteria set forth in Rule 23 are met. *See Dodge v. County of Orange*, 208 F.R.D. 79, 87 (S.D.N.Y.2002) (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). Plaintiffs bear the burden of establishing each requirement for class certification. *See Pecere v. Empire Blue Cross and Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y.2000).

The district court must accept all of the allegations in the pleadings as true on a motion for class certification, and avoid conducting a preliminary inquiry into the merits. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 477 n. 5 (S.D.N.Y. 2002) (citations omitted). Nonetheless, the decision whether to certify a class " 'may involve some considerations related to the factual and legal issues that comprise the plaintiff's cause of action.' " *Pecere*, 194 F.R.D. at 69 (quoting *D'Alauro v. GC Servs. Ltd.*, 168 F.R.D. 451, 454 (E.D.N.Y.1996)). *See also Daniels v. City of New York*, 198 F.R.D. 409, 413 n. 5 (S.D.N.Y.2001) (noting that the court need not rely on the bare allegations but "may consider the range of proof necessary to support class certification"). "[A]ffirmative defenses should [also]

be considered in making class certification decisions." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 295 (1st Cir.2000). *See Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996) (explaining that "a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues"). *Cf. Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir.1998) ("[W]hen the defendant's affirmative defenses ... may depend on facts peculiar to each plaintiff's case, class certification is erroneous.") (internal quotation marks and citation omitted).

## V. DISCUSSION

### A. Validity of Class Claims

Before addressing the specific requirements for class certification, MetLife argues that this Court should find that Dunnigan has no viable class claim because the "Second Circuit's premise for recognizing a claim of recovery of interest under ERISA—that interest constitutes equitable, 'make-whole' relief—has been undermined" by the Supreme Court in *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), which was decided the day before *Dunnigan*. *See* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification ("Def.Mem.") at 8–9.

In *Great–West*, an insurance company brought suit to compel a health plan beneficiary, who had recovered from a third-party tortfeasor, to make restitution to the plan for benefits it had paid. The issue was whether reimbursement to the health plan for payments made to a beneficiary by a third party constitutes "equitable relief" authorized by section 502(a)(3) of ERISA. *See* 534 U.S. at 206, 122 S.Ct. 708. The Court held that because the insurance company was seeking to impose personal liability on the plan beneficiary for a contractual obligation to pay money, the relief it sought was "legal," as opposed to "equitable," and was therefore not available under section 502(a)(3), which authorizes plan participants and fiduciaries to bring civil actions to obtain "appropriate equitable relief." *See id.* at 214, 122 S.Ct. 708.

■ *Great–West* has no bearing on the holding in *Dunnigan* because the relief Dunnigan seeks—an accounting of MetLife's profits made on withheld disability benefits—is a form of relief "typically available in equity," *see, e.g.*, 1 D. Dobbs, Law of Remedies, at 608–09 (2d ed.1993), and is clearly distinguishable from the legal relief barred by *Great–West*. The case at bar is a suit against a fiduciary to recover profits on property wrongfully held by the fiduciary, which the Supreme Court specifically differentiated from an action to impose personal contractual liability on a plan beneficiary. *See id.* ("For restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."); *see also Dobson v. Hartford Fin. Servs.*, 196 F.Supp.2d 152, 170–71 (D.Conn.2002) (finding claim for interest to be an "equitable claim for unjust enrichment rather than a legal claim for interest as compensatory relief" barred under *Great–West*). Thus, the relief Dunnigan seeks is available under section 502(a)(3).

■ Even if *Great–West* were to call into question the Second Circuit's holding in *Dunnigan*, MetLife is bound by the law of this case. *See North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 164–65 (2d Cir.1995) (stating that under the doctrine of law of the case, "a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time") (internal quotation and citation omitted). MetLife had an opportunity to seek reconsideration of the Second Circuit's decision in light of *Great–West*, but chose not to do so. *See* 1/16/02 Preliminary Conference Transcript at 4–5 (stating that MetLife was considering whether to seek reconsideration). Accordingly, the Second Circuit's decision in *Dunnigan* is binding.

Because Dunnigan has a viable class claim under section 502(a)(3), I now turn to the issue of class certification.

## B. Requirements for Class Certification

To be certified as a class under Rule 23 of the Federal Rules of Civil Procedure, plaintiffs must satisfy all requirements of subsection (a) and must prove that the class is "maintainable" as defined in subsection (b).

### 1. Rule 23(a)

Rule 23(a) permits one or more members of a class to sue as representative parties only if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In addition, while "Rule 23(a) does not expressly require that a class be definite in order to be certified[,] a requirement that there be an identifiable class has been implied by the courts." *Zapka v. Coca–Cola Co.,* No. 99 Civ. 8238, 2000 WL 1644539, at *2 (N.D.Ill. Oct. 27, 2000) (quoting *Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir.1977) (quotation marks omitted)); *see Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D.N.Y.1983). This requirement is often referred to as "ascertainability." *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 209 F.R.D. 323, 336 (S.D.N.Y.2002) (citing *Van West v. Midland Nat'l Life Ins. Co.,* 199 F.R.D. 448, 451 (D.R.I.2001)). Because all of these requirements are contested here, I will discuss each briefly.

### a. Implied Requirement of Ascertainability

■ Defendants argue that the proposed class does not meet the threshold require-ment of ascertainability. *See* Def. Mem. at 14–15. In order to bridge the "wide gap" between an individual's claim and "the existence of a class of persons who ha[s] suffered the same injury as the individual," *General Tel. Co. v. Falcon,* 457 U.S. 147, 157, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), plaintiffs must demonstrate the existence of an "aggrieved class." *See Sheehan v. Purolator, Inc.,* 839 F.2d 99, 102 (2d Cir.1988) (denying class certification because plaintiff failed to establish proof of an aggrieved class). Plaintiffs must also demonstrate that the aggrieved class can be readily identified. *See Simer v. Rios,* 661 F.2d 655, 669 (7th Cir. 1981) (denying class certification because it would have been a "Sisyphean task" to identify those individuals with viable claims).

■ "'An identifiable class exists if its members can be ascertained by reference to objective criteria.'" *In re MTBE,* 209 F.R.D. at 337 (quoting *Zapka,* 2000 WL 1644539, at *2). Where membership in the class requires a subjective determination, the class is not identifiable. *See Zapka,* 2000 WL 1644539, at *3 (declining to certify class where membership in class depended upon the state of mind of prospective members). Class members need not be ascertained prior to certification, but must be ascertainable at some point in the case. *See In re MTBE,* 209 F.R.D. at 337 (citation omitted).

As proof of the existence of an aggrieved class, Dunnigan has presented a 1999–2001 MetLife computer-generated list of individuals whose claims for LTD benefits were granted more than ninety days after their initial application for benefits. *See* Spreadsheet. The putative class members for that time period can be easily and objectively identified from this list by excluding one category of individuals: those who received an initial denial within ninety days that was reversed after the ninety day period had elapsed.[8] *See id.* (indicating with an "X"

---

8. MetLife argues that the putative class is not ascertainable because there is no reasonable means by which to identify those participants suffering unreasonably delay. *See* Def. Mem. at 15. This contention is premised on an incorrect characterization of the putative class. The proposed class is defined as participants whose claims for benefits were approved by MetLife more than ninety days after they were submitted without any notice within the ninety days of the need for an extension of time. The question of whether such delays were unreasonable goes to the merits of participants' claims—not to whether class certification is appropriate—and is there-

those claimants who do not meet the class definition because they received an initial denial within ninety days). Because Met-Life's new computer system contains the same information as its prior system, *see supra* Part II.B. n. 5, a similar list could be generated for the other relevant time periods in this lawsuit so that the remainder of the putative class can be identified. Even if MetLife is unable to run the database on the older statistical information, the class can be identified through an examination of the individual files of each of the participants. The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement. *See In re MTBE*, 209 F.R.D. at 337 n. 20 (acknowledging that the question of whether it would be "administratively burdensome" for the court to determine whether a particular individual is a class member is "primarily one of manageability, and not ascertainability"). Because Dunnigan has established the existence of an aggrieved class whose members can be readily identified, the implied requirement of ascertainability is met.

### b. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." "Impracticability does not mean impossibility of joinder, but rather difficulty or inconvenience of joinder." *Indep. Energy*, 210 F.R.D. 476, 2002 WL 1059086 at *2 (citing *In re Avon Sec. Litig.*, No. 91 Civ. 2287, 1998 WL 834366, at *5 (S.D.N.Y. Nov. 30, 1998)). Although precise calculation of the number of class members is not required, *see Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993), and it is permissible for the court to rely on reasonable inferences drawn from available facts, *see McNeill v. New York*

*Hous. Auth.*, 719 F.Supp. 233, 252 (S.D.N.Y. 1989), numbers in excess of forty generally satisfy the numerosity requirement. *See Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y.1992).

Dunnigan's proposed class clearly satisfies the numerosity requirement. At least 2,352 individuals have already been identified by Dunnigan as meeting the class definition for the period 1999–2001, and the total number of class members is estimated to be approximately 6,700.[9] *See* Riemer Aff. ¶ 3.

### c. Commonality

Commonality requires a showing that common issues of fact or law affect all class members. *See* Fed.R.Civ.P. 23(a)(2); *see also Trief*, 144 F.R.D. at 198. The commonality requirement may be met when individual circumstances of class members differ, but "'their inquiries derive from a unitary course of conduct.'" *Dodge v. County of Orange*, 208 F.R.D. at 88 (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir.1997)). A single common question may be sufficient to satisfy the commonality requirement. *See German v. Federal Home Loan Mortgage Corp.*, 885 F.Supp. 537, 553 (S.D.N.Y.1995). "The critical inquiry is whether the common questions are at the 'core' of the cause of action alleged." *D'Alauro v. GC Servs. Ltd.*, 168 F.R.D. 451, 456 (E.D.N.Y.1996); *see In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 166–67 (2d Cir.1987).

Dunnigan has identified a number of issues of law and fact common to all members of the proposed class, including: whether class members are entitled to interest as a result of MetLife's failure to decide their claims within ninety days; whether class

---

fore irrelevant here. *See In re MTBE*, 209 F.R.D. at 337 n. 20 ("'Certainly each potential plaintiff need not prevail on the merits in order to qualify as a class member, a theory which "would preclude certification of just about any class of persons alleging injury from a particular action."'") (quoting *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1104–06 (5th Cir.1993)).

9. MetLife argues that Dunnigan has failed to establish numerosity because "there is no reason to believe that ... the delay in awarding benefits" to the 2,352 class members identified by

Dunnigan was "attributable to any unreasonableness on MetLife's part." *See* Def. Mem. at 16. MetLife's opposition again improperly conflates class membership with an analysis of the merits. The relevant question is whether the putative class, as defined by Dunnigan, is so numerous that joinder would "make litigation needlessly complicated and inefficient." *Saddle Rock Partners Ltd. v. Hiatt*, No. 96 Civ. 9474, 2000 WL 1182793, at *2 (S.D.N.Y. Aug. 21, 2000). Clearly, it would be impracticable to join more than 2,352 plaintiffs.

members are entitled to an accounting of MetLife's profits on the retroactive benefits; and the standard for determining the rate of interest to be awarded for a breach of fiduciary duty. *See* Pl. Mem. at 10. Because these issues are "central" to Dunnigan's cause of action under section 502(a)(3)(B), the commonality requirement is satisfied.

MetLife challenges Dunnigan's showing of commonality by arguing that the relief sought by Dunnigan turns primarily on the resolution of an issue that is not common to the class: whether MetLife unreasonably delayed in its approval of the class members' LTD claims. *See* Def. Mem. at 17. The issue of the reasonableness of MetLife's delay is indeed a common question of law and fact because it affects the ability of all class members to recover under section 502(a)(3)(B). While the individualized issues of proof identified by MetLife are germane to the Rule 23(b)(3) inquiry into whether individual questions predominate over the common questions of law or fact, *see infra* Part IV.B.1, they do not defeat Dunnigan's showing of commonality under Rule 23(a)(2). *See, e.g., Daniels,* 198 F.R.D. at 417–18; *Augustin v. Jablonsky,* No. 99–CV–3126, 2001 WL 770839, at *4–*5 (E.D.N.Y. Mar. 8, 2001).

#### d. Typicality

■ A named plaintiff's claims are "typical" under Rule 23(a)(3), where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. *See Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 155 (2d Cir.2001). *See also Robidoux,* 987 F.2d at 936–37 ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."). " 'While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become

the focus of the litigation.' " *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir.2000) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990) (internal citation omitted)).

■ Although Dunnigan's claim for interest arises from the same course of conduct as that of the other class members—MetLife's delay—the resolution of her claim will depend upon whether MetLife's delay in resolving Dunnigan's claim was unreasonable. That inquiry will likely be based on the following issues: the nature of the disagreement among physicians as to whether Dunnigan suffered from CFS, and if so, the extent to which this ailment rendered her disabled, *see* Sullivan Aff. ¶¶ 20, 23, 24, 25; the reasons why MetLife permitted multiple appeals of Dunnigan's claim, rather than simply rendering a final determination, *see id.* ¶ 29; and the extent to which the delay was due to Dunnigan's own failure to respond timely to requests for information, submit to requested examinations, and appeal from the denial of her claim, *see id.* ¶ 30. Because these issues and defenses are unique to Dunnigan, she is not "typical" of the class.

#### e. Adequacy of Representation

■ Even if the Court were to find Dunnigan "typical," she must also show that the proposed action will fairly and adequately protect the interests of the class. *See* Fed. R.Civ.P. 23(a)(4); *Banyai v. Mazur,* 205 F.R.D. 160, 164 (S.D.N.Y.2002). To do so, Dunnigan first must demonstrate that "class counsel is qualified, experienced, and generally able to conduct the litigation." *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992). Here, MetLife does not dispute that plaintiff's counsel, both of whom have significant experience in litigation and employee benefit/ERISA matters, are eminently qualified and experienced in conducting this type of class litigation.

Dunnigan is also required to show that she has no interests that are antagonistic to the proposed class members and that she shares the desire to vigorously prosecute the action. *See id.; see also Robinson,* 267 F.3d at 170

(noting Rule 23(a)(4) requires an "absence of conflict" between the named representatives and the class members, as well as "vigorous prosecution"). Although Dunnigan's claim is unique, *see supra* discussion on typicality, there is no evidence in the record to suggest that her interests conflict with those of the putative class members or that she will not aggressively litigate the case. Accordingly, the adequacy of representation requirement is met.

### 2. Rule 23(b)(3)

Even if the typicality requirement could be cured, Dunnigan cannot establish that the action is "maintainable" as defined by Rule 23(b). Rule 23(b) provides that "an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition" one of three alternative definitions of maintainability, (b)(1)-(3), is met. Dunnigan argues that this action meets the definition articulated in subsection (b)(3), which is "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

### a. Predominance

■■■■■ "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof." *Visa Check,* 280 F.3d at 136 (internal quotation marks and citation omitted). Because Rule 23(b)(3) requires that common issues predominate, courts deny certification where individualized issues of fact abound. *See, e.g., Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1255-56 (2d Cir.2002) (denying class certification because defendant's liability for fraud required individualized proof of statements made to class members and therefore individual issues predominated over issues common to the putative class); *Doe v. Guardian Life Ins. Co.,* 145 F.R.D. 466, 476 (N.D.Ill. 1992) (holding predominance requirement not

satisfied in suit seeking benefits for treatment of bipolar disorder because of the need for individualized inquiries on the accuracy of the diagnoses, noncoverage, and estoppel).

"The 23(b)(3) predominance requirement is 'more stringent' and 'far more demanding than' the commonality requirement of Rule 23(a)." *Maneely v. City of Newburgh,* 208 F.R.D. 69, 76 (S.D.N.Y.2002) (quoting *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 623-24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)) (other citation omitted). Courts frequently have found that the requirement was not met where, notwithstanding the presence of common legal and factual issues that satisfy the commonality requirement, the resolution of individual claims for relief would require individualized inquiries. *See, e.g., Augustin,* 2001 WL 770839 at *13 (E.D.N.Y.2001) (finding individualized issues of proximate causation predominate despite plaintiffs' showing of commonality under Rule 23(a)(2)); *Martin v. Shell Oil Co.,* 198 F.R.D. 580, 592-93 (D.Conn.2000) (finding individualized proof of breach, causation, and trespass predominates where commonality was not contested).

All of the courts that have addressed class certification on section 502(a)(3) claims for interest for retroactive benefits have denied certification because interest on delayed benefits is an equitable remedy that requires an individualized assessment of each class member's claim, which makes the predominance requirement impossible to satisfy. *See, e.g., Dobson,* 196 F.Supp.2d at 165 (finding class action for interest untenable because the issue of whether defendant was "justified in exceeding the time limits in any particular case will require individualized assessment of the information available to [defendant] within the regulation period, the complexity of the claim of disability, and other claims handling factors"); *McDonald v. Pension Plan of the NYSA–ILA Pension Trust Fund,* 153 F.Supp.2d 268, 298-99 (S.D.N.Y.2001) (agreeing with holding in *Dunnigan* that a "class action format is not suitable for the individualized treatment required" in an action for interest on delayed benefits); *Miner v. Empire Blue Cross/Blue Shield,* No. 97 Civ. 6490, 2001 WL 96524, at *5 (S.D.N.Y. Feb. 5,

2001) (holding that plaintiff could not maintain class action seeking lost interest because an " 'individualized evaluation of the facts, allegations and equities surrounding each case' must be made to meet both 'the requirement that equitable relief be premised on an underlying breach' and ERISA's goals.' ") (quoting *Dunnigan,* 99 F.Supp.2d at 325–26); [10] *Holmes v. Pension Plan of Bethlehem Steel Corp.,* No. 98 Civ. 1241, 1999 WL 554591, at *7 (E.D. Pa. June 30, 1999), *aff'd in part and rev'd in part on other grounds,* 213 F.3d 124 (3d Cir.2000) (finding claim for interest on delayed benefits "unsuitable for class treatment" because such equitable claims require courts "to make individualized assessments of each claim, examine the individual facts behind each claim, balance the equities, and determine that a benefit payment was improperly delayed."). Because there is "no single, objective formula for calculating each class member's interest entitlement," courts have held that class certification in this context is inappropriate. *Holmes,* 213 F.3d at 137.

Here, determining MetLife's liability for each class member's claim under section 502(a)(3)(b) will require an individualized evaluation of whether MetLife's delay in making the benefit determination was unreasonable. Whether MetLife was justified in exceeding the time limits in any particular case will turn on a number of discreet factual issues, including whether the participant provided requested information in a timely fashion and whether there were other facts and circumstances that would explain MetLife's inability to make a benefit determination within the period prescribed by the regulations. Because MetLife's liability on each class member's claim cannot be established without individualized inquiries, individualized issues predominate and class certification is improper.

 Dunnigan contends that individual questions do not predominate because MetLife had a common pattern and practice of failing to determine claims within ninety days

and failing to pay interest on the late payments. *See* Pl. Mem. at 12. Rather than fully explain this contention, however, Dunnigan focuses her predominance argument exclusively on why MetLife is estopped in this case from raising the affirmative defense that it acted reasonably under the circumstances. Dunnigan makes the following specific arguments: (1) each class member is entitled to a rebuttable presumption, pursuant to the Second Circuit's decision, that MetLife's failure to render a decision within ninety days was unreasonable as a matter of law and that this presumption necessitates a finding that common issues predominate, *see id.* at 12–14; (2) MetLife cannot rebut the presumption because it is time-barred from asserting "special circumstances" due to its failure to meet the ninety day deadline specified in the DOL regulations, *see id.* at 14–16; and (3) MetLife cannot rebut the presumption because it is equitably precluded from asserting individualized special circumstances due to its failure "to adopt and maintain reasonable claims procedures that assured the timely processing of claims," *id.* at 2, 16–21.

Indeed, the only way class certification would be appropriate here would be if MetLife were estopped from raising the affirmative defense of reasonableness. However, there is no legitimate basis, for the reasons that follow, to find that MetLife is precluded from raising this defense.

*First,* it is unclear whether the Second Circuit intended to create a legal presumption of unreasonableness. The relevant language, to which Dunnigan refers, is: "Unless such a delay is justified, we see no reason why [the delay] does not constitute a breach of fiduciary duty" and "Absent good cause shown by the Plan administrator justifying a longer period, *it is arguable* that the ninety-day period specified by the regulations of the Secretary of Labor ... for the making of such determinations, defines the duration of the reasonable period during which the Plan is not chargeable with an interest obligation." *Dunnigan,* 277 F.3d at 230–31 (emphasis added). Had the Circuit intended to create a

---

**10.** Although *McDonald* and *Miner* were decided before the Second Circuit changed the standard for recovery under section 502(a)(3)(B), the shift from "bad faith" to "unreasonable delay" does

not alter the fact that a class action does not permit the individualized analysis required by a claim for interest based upon a breach of fiduciary duty.

rebuttable presumption, it likely would have used such language. *See Dobson,* 196 F.Supp.2d at 161 (rejecting argument that any payment outside of the time-frames in the DOL's regulations is *per se* unreasonable on the basis that "the Second Circuit [in *Dunnigan*] simply observed that it would be possible to ascertain a point at which [Met-Life's actions] became unreasonable."). Nevertheless, even if there were a rebuttable presumption, that would not require a finding that common questions predominate.

Dunnigan's argument relies exclusively on securities law cases, in which courts have found that common issues predominate where there is a rebuttable presumption of reliance [11] despite the existence of fact-specific defenses. *See* Pl. Mem. at 13 (citing *Basic,* 485 U.S. at 249, 108 S.Ct. 978 and *Cromer,* 205 F.R.D. at 130). However, the presumption of unreasonableness in the ERISA context is clearly distinguishable from the presumption of reliance in the securities context.

The presumption in securities cases is based on the fact that reliance is not amenable to direct proof. *See Basic,* 485 U.S. at 245, 108 S.Ct. 978 (noting that the presumption created by the fraud-on-the-market theory will "assist courts in managing circumstances in which direct proof . . . is rendered difficult"); *Cromer,* 205 F.R.D. at 128 (acknowledging that the fraud-on-the-market theory arose as a "practical response to the difficulties of proving direct reliance in the context of modern securities markets, which feature impersonal trading rather than face-to-face transactions"). On the contrary, unreasonable delay can be proved easily by direct proof.

Moreover, the issue of unreasonableness here is outcome-determinative, unlike in the securities context where reliance is only one of the many elements of a cause of action for securities fraud and often the least contentious. Thus, defendants are more likely here to put forth evidence to rebut the presumption, thereby requiring the Court to hold many mini-trials on the individual issues, which would be wholly inefficient.[12] *See Holmes,* 1999 WL 554591 at *7 (acknowledging that courts have refused to certify a class where "determining membership in the class would essentially require a mini-hearing on the merits of each case") (internal quotation and citation omitted). Thus, unlike in the securities law context, there is no reason here to find that the rebuttable presumption of unreasonableness satisfies the predominance requirement. *See Holmes,* 213 F.3d at 131 (ruling that claims for interest on delayed benefits are not suitable to class certification even though the Circuit Court had explicitly recognized that " 'interest is presumptively appropriate' ") (quoting *Fotta v. Trustees of the United Mine Workers of Am. Health & Ret. Fund,* 165 F.3d 209, 214 (3d Cir.1998)).

*Second,* MetLife is not time-barred from asserting its defense of reasonableness by failing to send a notice to putative class members, indicating the existence of "special circumstances", because claimants were made aware of the reasons for MetLife's delay through other means. *See* Sullivan Aff. ¶ 11 (stating that a participant is made aware of the circumstances or reasons for any delay in adjudicating her claim by virtue of the ongoing communication she had with the case manager). Although the Second Circuit has recognized that "under the law applicable to insurance policies, an insurer may be barred from raising defenses not

---

**11.** The presumption of reliance in security cases is based on the "fraud-on-the-market" theory in which "an individual plaintiff need not show that [s]he actually read or heard a misrepresentation," but is instead "presumed to have relied on it by virtue of h[er] reliance on a market that fully digests all available material information about a market and incorporates it into that security's price." *See Cromer Fin. Ltd. v. Berger,* 205 F.R.D. 113, 128–29 (S.D.N.Y.2001) (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 243–44, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

**12.** In securities cases, the presumption is often rebutted by showing the inapplicability of the fraud-on-the-market theory (*i.e.* because the relevant securities market is not an "efficient" market) and does not require a myriad of individual determinations. *See, e.g., RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 185 F.Supp.2d 389, 404 (S.D.N.Y.2002) (considering whether the fraud-on-the-market theory applies); *In re Laser Arms Corp. Sec. Litig.,* 794 F.Supp. 475, 490 (S.D.N.Y.1989) (same).

asserted in communications to the insured denying coverage," *Juliano v. Health Maint. Org. of New Jersey, Inc.*, 221 F.3d 279, 288 (2d Cir.2000) (citing *New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991)), the Circuit has left open the question of whether waiver applies in the ERISA context, directing courts to conduct a case-specific analysis. *See Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 381 (2d Cir.2002).

The purpose of applying the waiver doctrine in insurance cases is to encourage administrators to assert candidly all of their reasons for denying coverage so that the claimant can challenge that determination, if she so desires. *See id.* at 382 (expressing concern that plan administrators will "try the easiest and least expensive means of denying a claim while holding in reserve another, perhaps stronger, defense should the first one fail"); *Juliano*, 221 F.3d at 288 ("An administrator's failure to inform a member of a reason for denial deprives the member of the ability to make a contrary case to the administrator."). Because MetLife has procedures in place for informing claimants of its delay, its failure to set forth those reasons in a written notice in no way prejudices claimants' ability to challenge those reasons. Thus, the purpose of the waiver doctrine would not be advanced here. There is therefore no reason to preclude MetLife from asserting the affirmative defense of reasonableness.[13]

*Third,* MetLife is not equitably precluded from asserting individualized special circumstances because its claims procedures are not *per se* unreasonable. Technical violations of regulations do not give rise, on their own, to a breach of fiduciary duty. *See Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 113 (1st Cir.2002) (upholding dismissal of breach of fiduciary duty claim be-

cause "[t]echnical violations of ERISA's notice provisions generally do not give rise to substantive remedies outside § 1132(c) unless there are some exceptional circumstances, such as bad faith, active concealment, or fraud"); *Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir.1998) (dismissing claim for failure to specify the materials necessary to pursue an appeal because "ERISA's notice requirements are not meant to create a system of strict liability for formal notice failures"); *Hines v. Massachusetts Mut. Life Ins. Co.*, 43 F.3d 207, 211 (5th Cir.1995) (upholding dismissal of breach of fiduciary duty claim for failure to notify participant of change in medical policies because "[f]ailure to fulfill procedural requirements [of notice] ... does not give rise to a substantive damage remedy [for fiduciary breach]"); *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir.1994) (holding failure to satisfy specificity requirements for notification of denial of benefits did not violate ERISA, in light of substantial compliance due to additional reports). Like the failure to determine a claim within the ninety day period, the failure to send an extension notice would not give rise to an automatic entitlement to relief. Thus, such failure cannot render an entire claims procedure unreasonable.

For similar reasons, the other limitations of MetLife's claims procedures noted by Dunnigan are insufficient to render MetLife's entire system unreasonable. While MetLife's ability to render timely decisions would likely improve if it had a form extension letter available to its claim staff, an individual responsible for assuring claims were decided on a timely basis, or a computer "bell" notice to inform claim representatives that the ninety day period was coming to an end, the failure to adopt such procedures does not make the system *per se* un-

---

**13.** Dunnigan argues that the strict enforcement of time limitations on a participant's ability to file for a review of a benefits determination, *see* DOL Reg. § 2560.503–1(g)(3) (providing for the dismissal of actions not filed within the 60–day review deadline), should apply with equal force to the insurer's ability to assert an affirmative defense for its delay. *See* Pl. Mem. at 15–16 (citing *Sanfilippo v. Provident Life and Casualty Ins. Co.*, 178 F.Supp.2d 450, 458 (S.D.N.Y. 2002)). However, the preclusion of a partici-

pant's untimely claim is grounded in the exhaustion of administrative remedies requirement, which has a strong public policy basis, whereas the preclusion of an insurer's defense would be grounded in the enforcement of a technical notice requirement—the violation of which does not even give rise to liability. *See infra* discussion of violation of regulations. Even if the analogy were appropriate, delay may be excused for equitable considerations. *See Tiger v. AT & T Tech. Plan*, 633 F.Supp. 532, 534 (E.D.N.Y.1986).

reasonable. MetLife has adopted many procedures designed to insure that claims are determined in a timely fashion.[14] *See supra* Part II.B. The statistical evidence regarding the number of claims that are timely decided reveals that those efforts are, for the most part, successful.

Despite Dunnigan's creative attempts to establish a basis upon which the class would be automatically entitled to a finding of unreasonableness, thereby obviating the need to assess the individualized defenses, no such ground exists. Accordingly, individual fact issues will predominate over the common issues and class certification is inappropriate.

### b. Superiority

The superiority question under Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication. The court should consider, *inter alia*, "the interest of the members of the class in individually controlling the prosecution or defense of separate actions" and "the difficulties likely to be encountered in the management of a class action." Fed.R.Civ.P. 23(b)(3).

■ If a class were certified here, the Court would be required to conduct a series of mini-trials in order to determine, for each participant, whether the delay in the award of benefits was unreasonable. Under these circumstances, a class action is not a feasible, let alone superior, method for the fair, efficient, and manageable adjudication of the putative class's claims for interest. *See Doe v. Guardian Life Ins. Co.*, 145 F.R.D. 466, 476 (N.D.Ill.1992) (denying certification of a proposed class where a series of "mini-trials" would be required to litigate issues relevant to eligibility for health benefits because certi-

fication would not comport with Rule 23's purpose of promoting efficiency).[15]

### C. Issue Certification

■ Dunnigan proposes, in the alternative, that the Court certify the class with respect to the issue of "whether MetLife is time barred by the lack of extension notices and precluded by the absence of reasonable claims procedures from establishing good cause for its delays in making benefit determinations." *See* Pl. Mem. at 22; *see also* Fed.R.Civ.P. 23(c)(4)(A) (stating, in pertinent part, that "[w]hen appropriate, [ ]an action may be brought or maintained as a class action with respect to particular issues...."). Because the specific legal issues that Dunnigan seeks to certify have been resolved herein, there is no need to consider issue certification. Dunnigan's request for issue certification therefore is denied.

## VI. CONCLUSION

For the foregoing reasons, Dunnigan's motion for class certification is denied. A conference is scheduled for January 9, 2003 at 11:00 a.m.

■

---

**14.** Contrary to Dunnigan's assertion, *see* Pl. Mem. at 17–18, MetLife's Certificate does describe the ninety day time limit for rendering decisions, *see* Cert. Rider, as does the CMG, *see* CMG at App. H1–3.

**15.** Dunnigan argues that this is a classic "negative value case," for which class actions are the superior method for resolving controversies, because there are a significant number of class members and their individual interests are small. However, Dunnigan has offered no evidence of the amount of interest she claims is due to putative class members. Without such evidence, the

Court cannot find that the class members' interests are too small to bring individual actions for unpaid interest. On the contrary, the Court is aware of actions brought by individual beneficiaries for unpaid interest. *See, e.g., Fotta*, 165 F.3d 209. While the Court is sympathetic to Dunnigan's argument that denial of class certification will likely result in the filing of many individual suits for interest, the bringing of individual suits is no less efficient, and indeed more appropriate, than the adjudication of individual claims of unreasonableness through a large number of minitrials.